**Stella A. TURNER, Plaintiff,**

**v.**

**Robert M. BLACKBURN, Clerk of Superior Court for Mecklenburg County, et al., Defendants.**

**No. C–C–73–68.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Heard Oct. 18, 1974.

Decided Feb. 12, 1975.

---

Donald S. Gillespie, Jr., Charlotte, N.C., for plaintiff.

Robert Morgan, Atty. Gen. of N.C., and George W. Boylan, Associate Atty. Gen., Raleigh, N.C. for defendant Blackburn.

Charles D. Gray, III, Gastonia, N.C. for defendants Gray and Dixie Acceptance Corp.

Frank L. Schrimsher, Charlotte, N.C. for defendant Watts.

Before CRAVEN, Circuit Judge, JONES, Chief District Judge, and McMILLAN, District Judge.

CRAVEN, Circuit Judge.

This three-judge court was convened to consider an attack on North Carolina's procedure for real property mortgage foreclosure, sale, and eviction, as depriving the plaintiff/mortgagor of her property without due process of law under the fourteenth amendment.

Plaintiff, a widowed domestic worker, and her mother owned a residence house and lot located in Charlotte, North Carolina, encumbering it at the time of purchase [1] in 1965 by a first deed of trust in favor of a local bank. In 1966 the plaintiff contracted for the installation of aluminum siding on her house, signing an installment note for $4,543.56 and securing the obligation by a second deed of trust on the property.[2] The note and the second deed of trust were respectively negotiated and assigned by the aluminum siding contractor to defendant, Dixie Acceptance Corporation; defendant Gray is the trustee.

In 1972 plaintiff fell behind on her second mortgage, and in November, with payments six months in arrears, Dixie requested Gray to commence foreclosure proceedings. Advance notice of the public sale was given in conformity with the statute,[3] which requires posting at the

---

1. The deed recites a consideration of $6,750. The amount of the mortgage was $4,500, to be paid by monthly payments of $50.

2. Plaintiff's mother was co-obligor on the second mortgage also. She had lived with the plaintiff and the latter's three children and helped with both mortgage payments until her death in 1971, after which plaintiff became sole owner of the house. Plaintiff testified that it was her mother's death which led to her subsequent financial difficulty.

3. N.C.Gen.Stat. § 45–21.17 (1966 & Supp. 1974), the focus of plaintiff's due process challenge, provides:

 (a) When the instrument pursuant to which a sale of real property is to be held contains provisions with respect to posting or publishing notice of sale of the real property, such provisions shall be complied with, and compliance therewith is sufficient notice.

 (b) When the instrument pursuant to which a sale of real property is to be held contains no provision with respect to posting or publishing notice of the sale of real property, the notice shall—

 (1) Be posted, at the courthouse door in the county in which the property is situated, for thirty days immediately preceding the sale.

 (2) And in addition thereto,
 a. If a newspaper qualified for legal advertising is published in the county, the notice shall be published in such a newspaper once a week for at least four successive weeks; but

 b. If no such newspaper is published in the county, then notice shall be published once a week for at least four successive weeks in a newspaper having a general circulation in the county.

courthouse door and newspaper publication but *not* personal notice to the mortgagor. At the foreclosure sale, on January 18, 1973, Dixie submitted a high bid of $1,904.90, which was calculated to be precisely the sum of the balance due on the note plus fees, commissions, and expenses.

As required by statute,[4] Gray, on January 18, 1973, reported the foreclosure sale to the defendant Blackburn, the Clerk of the Mecklenburg County Superior Court, the county of both situs and sale. Blackburn filed the preliminary report that same day.

No satisfaction of the debt having been made [5] nor upset bid [6] filed with Blackburn within ten days after the filing of the preliminary report, the rights of the parties to the sale—Dixie and Gray—became fixed.[7]

---

(c) When the notice of sale is published in a newspaper,
 (1) The period from the date of the first publication to the date of the last publication, both dates inclusive, shall not be less than twenty-two days, including Sundays, and
 (2) The date of the last publication shall be not more than 10 days preceding the date of the sale.
(d) When the real property to be sold is situated in more than one county, the provisions of subsections (a) or (b) whichever is applicable, and subsection (c) shall be complied with in each county in which any part of the property is situated.

4. N.C.Gen.Stat. § 45–21.26 (1966) provides:
 (a) The person exercising a power of sale of real property, shall, within five days after the date of the sale, file a report thereof with the clerk of the superior court of the county in which the sale was had.
 (b) The report shall be signed by the person authorized to hold the sale, or by his agent or attorney, and shall show—
 (1) The authority under which the person making the sale acted;
 (2) The name of the mortgagor or grantor;
 (3) The name of the mortgagee or trustee;
 (4) The date, time and place of the sale;
 (5) A reference to the book and page in the office of the register of deeds, where the instrument is recorded or, if not recorded, a description of the property sold, sufficient to identify it, and, if sold in parts, a description of each part so sold;
 (6) The name or names of the person or persons to whom the property was sold;
 (7) The price at which the property, or each part thereof, was sold, and that such price was the highest bid therefor;
 (8) The name of the person making the report; and
 (9) The date of the report.

5. If prior to sale or within ten days thereafter the mortgagor pays off the obligation (and the trustee's expenses), the power of sale or sale is nullified. N.C.Gen.Stat. § 45–21.20 (Supp.1974); *see* Cherry v. Gilliam, 195 N.C. 233, 141 S.E. 594 (1928) (mortgagor's timely conveyance to third party and accompanying payment of mortgage nullifies sale).

6. An "upset" or "raised" bid, timely submitted to the clerk and accompanied by the necessary deposit and/or bond (*see* N.C.Gen.Stat. § 45–21.27 (Supp.1974), text at n. 30 *infra*) requires the clerk to order a resale. N.C.Gen. Stat. § 45–21.29(a) (1966). Notice by posting and publication—identical with that of § 45–21.17, except for the shorter time periods—must be given. *Id.*, (b)–(d). In pertinent part, § 45–21.29 also provides:
 (e) The person holding the resale shall report the resale in the same manner as required by G.S. 45–21.26.
 (f) When there is no bid at a resale other than the upset bid resulting in such resale, the person who made the upset bid is deemed the highest bidder at the resale. Such resale remains subject to other upset bids and resales pursuant to this article.
 (g) Resales may be had as often as upset bids are submitted in compliance with this article.
 (h) When a resale of real property is had pursuant to an upset bid, such sale may not be consummated until it is confirmed by the clerk of the superior court. No order of confirmation may be made until the time for submitting any further upset bid, pursuant to G.S. 45–21.27, has expired.
 (i) Except as otherwise provided in this section, all the provisions of this article applicable to an original sale are applicable to resales.
 (j) The clerk of the superior court shall make all such orders as may be just and necessary to safeguard the interests of all parties, and shall have authority to fix and determine all necessary procedural details with respect to resales in all instances in which this article fails to make definite provision as to such procedure.

7. N.C.Gen.Stat. § 45–21.29A (Supp.1974) provides:
 No confirmation of sales of real property made pursuant to this article shall be re-

On February 15, 1973, Gray, as required,[8] presented a "Final Report and Account" of the sale, which showed, *inter alia*, receipts and disbursements, a copy of the posted notice with a deputy clerk's signed affirmation of the date of posting, and a copy of the published notice with an accompanying affidavit attesting to the fact of publication. A deputy clerk, upon payment of a $10 fee, audited and approved the final report and filed it that day.

Also on February 15, 1973, defendant Watts—to whom Dixie had assigned its bid[9]—purchased the property for the same amount, $1,904.90, and became the owner of record.

Plaintiff learned of the foreclosure proceedings for the first time in mid-March when Watts visited the property to inspect his purchase.[10]

On March 26, 1973, pursuant to statute,[11] Watts filed a verified "Petition for Application of Writ of Assistance and Possession" with Blackburn. It recited the relevant facts regarding the sale and alleged on belief that plaintiff had been in continuous possession of the property and had refused to surrender same. Blackburn issued a "Notice and Order of Service" directing the sheriff to serve same, together with a copy of the petition, on plaintiff, who was thereby advised to appear at a hearing before the

---

quired except as provided in G.S. 45-21.29 (h) for resales. If in case of an original sale under this article no upset bid has been filed at the expiration of the ten-day period, as provided in G.S. 45-21.27, the rights of the parties to the sale become fixed.
*See also* Certain-Teed Products Corp. v. Sanders, 264 N.C. 234, 141 S.E.2d 329 (1965); Britt v. Smith, 6 N.C.App. 117, 169 S.E.2d 482 (1969).

8. N.C.Gen.Stat. § 45-21.33 (1966) provides:
 (a) A person who holds a sale of real property pursuant to a power of sale shall file with the clerk of the superior court of the county where the sale is held a final report and account of his receipts and disbursements within thirty days after the receipt of the proceeds of such sale. Such report shall show whether the property was sold as a whole or in parts and whether all of the property was sold. The report shall also show whether all or only a part of the obligation was satisfied with respect to which the power of sale of property was exercised.
 (b) The clerk shall audit the account and record it.
 (c) The person who holds the sale shall also file with the clerk—
 (1) A copy of the notices of sale and resale, if any, which were posted, and
 (2) A copy of the notices of sale and resale, if any, which were published in a newspaper, together with an affidavit of publication thereof, if the notices were so published.
 (d) The clerk's fee for auditing and recording the final account is a part of the expenses of the sale, and the person holding the sale shall pay the clerk's fee as part of such expenses.

9. The assignment was made on February 6, 1973; it authorized the trustee to convey the property upon payment by Watts. The notarized document was filed with the clerk on February 15, 1973.

10. Watts had by then paid off the senior mortgagee in the amount of $1,095.80, making his total investment $3,000.70. When he came to inspect his property, he offered plaintiff a choice: either get out or repurchase her home for $6,500.

11. N.C.Gen.Stat. § 45-21.29 (k) (Supp.1974) provides:
 (k) Orders for possession of real property sold pursuant to this article, in favor of the purchaser and against any party or parties in possession at the time of the sale who remain in possession at the time of application therefor, may be issued by the clerk of the superior court of the county in which such property is sold, when:
 (1) Such property has been sold in the exercise of the power of sale contained in any mortgage or deed of trust or granted by this article, and
 (2) The purchaser is entitled to possession, and
 (3) The purchase price has been paid, and
 (4) The sale has been consummated, or if a resale is held, such resale has been confirmed, and
 (5) Ten days' notice has been given to the party or parties in possession at the time of the sale or resale who remain in possession at the time application is made, and
 (6) Application is made to such clerk by the mortgagee, the trustee named in such deed of trust, any substitute trustee, or the purchaser of the property.

clerk on April 11, 1973, and show cause why she should not be evicted.

This § 1983[12] action was filed on March 27, 1973.[13] Plaintiff seeks a declaration[14] that N.C.Gen.Stat. § 45–21.17[15] violates due process for failing to assure notice and an opportunity to be heard prior to foreclosure conducted pursuant thereto, and permanent injunctive relief against all North Carolina Superior Court Clerks restraining them from both filing preliminary reports (§ 45–21.26)[16] and auditing, approving, and filing final reports (§ 45–21.33)[17] unless there is a showing either (1) that prior notice and an opportunity for hearing have been given or (2) that those rights have been waived.[18]

We are confronted with three questions:

(1) Is the state sufficiently involved in the foreclosure proceedings so as to satisfy the "state action" requirement of the fourteenth amendment and § 1983?

(2) Is the plaintiff entitled to notice and hearing, in some form, prior to the foreclosure. absent an express waiver?

(3) Has there been an express waiver of due process rights?

Answering the first two questions affirmatively, we conclude that North Carolina's foreclosure procedure is unconstitutional under the fourteenth amendment and, finding no waiver, we hold that the plaintiff is entitled to relief.

I.

■ The procedural due process clause of the fourteenth amendment speaks only to the states. It is thus essential to plaintiff's cause of action that there be "state action." She asserts there is because the state officials—the clerk and the sheriff—participate directly in the challenged activity: the deprivation without procedural safeguards of ownership and possessory rights to real property. Citing the minimal involvement of state officials in the debtor-creditor disputes at issue in the *Sniadach-Fuentes-Mitchell*[19] trilogy, plaintiff insists that the extensive statutory duties and powers of the clerk (and sheriff) render this case indistinguishable from the state action found, albeit without discussion, in each of those rulings.[20]

12. 42 U.S.C. § 1983 (1970) provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

13. Plaintiff's request for a preliminary injunction to bar eviction and otherwise preserve the *status quo* was granted by Judge McMillan on June 13, 1973, after a hearing. The order was conditioned on plaintiff's paying Watts $100 per month to cover her obligations on both mortgages, the amount to be treated as rent should she not prevail.

14. 28 U.S.C. §§ 2201, 2202 (1970).

15. Text at n. 3 *supra.*

16. Text at n. 4 *supra.*

17. Text at n. 8 *supra.*

18. We note that a grant of the relief requested would also serve to prevent the clerk and the sheriff from enforcing eviction procedures under § 45–21.29(k) because the ten-day period, after which a sale may be "consummated" (absent the intervention of an upset bid), does not commence to run until the preliminary report of sale is filed. Carlisle v. Commodore Corp., 15 N.C.App. 650, 190 S.E.2d 703 (1972); § 45–21.27(a), text at n. 30 *infra.*

19. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). *Fuentes*, like our case, arose under 42 U.S.C. § 1983. *See also* North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

20. We are also urged to consider "indirect" state action rationales utilized by the Supreme Court when it perceived the state lurking in the background of the challenged conduct: (1) where the private deprivation or

In response, the defendants assert that the state has neither acted directly nor become "significantly involved" [21] with the foreclosure proceedings. Negating the "direct action" theory, the defendants assert that the deprivation was purely private: "the realty in question was foreclosed pursuant to an entirely self-executing power of sale without the aid, assistance, or comfort of any agent of the state." [22] The other state action concepts are dismissed as distinguishable in that the instant case presents no "significant" state involvement. [23]

Fairly stated, the defendants' argument reduces to the following: (1) the decision to foreclose when default is apparent is a private one pursuant to the trustee's contractual duties; [24] (2) the choice of conducting the public sale under § 45–21.17(a) (agreed-upon form of notice) or (b) (incorporation of statutory notice) is dictated solely by the deed of trust; (3) since no upset bid was filed, consummation of the public sale occurred without direction from or participation by the clerk; [25] (4) the "deprivation without notice"—public sale and subsequent closing—is thus a private, self-executing act mandated by and conducted solely under a contractual power; (5) since the sale is "already consummated" when the clerk "enters the picture," his subsequent "passive" acceptance of papers for filing merely reflects, not causes, the injury; [26] (6) any subsequent eviction by the sheriff at the direction of the clerk does not cause an

discrimination has been enforced judicially, Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); (2) where the state places itself in a "symbiotic relationship" so as to become a "joint participant" in the challenged activity, see Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); (3) where the state has encouraged private parties to deny the protected right, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); (4) where the state has delegated a traditional government function, thereby authorizing private parties to act in its stead, e. g., Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). See generally Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Col.L.Rev. 656 (1974).

21. Principal reliance is based upon "no state action" findings in recent due process attacks on public utility termination, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); creditor self-help repossession, e. g., Shirley v. State National Bank, 493 F.2d 739 (2d Cir. 1974), but see id., at 745 (Kaufman, C. J., dissenting); and discipline of student antiwar demonstrators at a private university, Powe v. Miles, 407 F.2d 73 (2d Cir. 1968).

22. Brief for Defendants at 5.

23. Moose Lodge, supra, 407 U.S. at 173, 92 S.Ct. 1965, quoting from Reitman, supra, 387 U.S. at 380, 87 S.Ct. 1627. See Jackson v. Metropolitan Edison Co., supra.

24. The deed of trust, after reciting the fact of conveyance by plaintiff to the trustee, provides:

This conveyance, however, is in trust, and should Grantor pay [the underlying debt], this conveyance shall be void; otherwise, and in the event that Grantor [defaults], then this deed shall remain in force . . . and said Trustee shall, upon demand of the Beneficiary, his successors or assigns [Dixie], proceed to sell the . . . property at public auction, at the front door of the Court House . . . to the highest bidder for cash, first giving the notice required by the laws of North Carolina in respect to exercising power of sale under deeds of trust then in effect, and upon such sale shall execute and deliver a deed in fee simple . . . to the purchaser . . ., and said Trustee shall receive the proceeds . . . out of which he shall pay [expenses, insurance, taxes], and next to the Beneficiary all amount due . . . on said note, and the balance, if any, shall be paid to the parties entitled to same according to law.

25. "Where a foreclosure sale is conducted in accordance with the [statutory provisions], and no upset bid is filed as provided in G.S. § 45–21.27, there is no legal requirement that the clerk either confirm the sale or direct the execution of a trustee's deed as a prerequisite to legal consummation of such sale by the trustee." Certain-Teed Products Corp. v. Sanders, 264 N.C. 234, 141 S.E.2d 329, 336 (1965). The Certain-Teed rule has been codified in § 45–21.29A, text at n. 7 supra.

26. "Putting the point another way, the state action, not the private action, must be the subject of complaint." Powe v. Miles, 407 F. 2d 73, 81 (2d Cir. 1968).

*unconstitutional* deprivation since the statute [27] requires ten days' prior notice and, at least *implicity, opportunity* for hearing (before the clerk).

It is a good argument but hinges, we think, upon a rather myopic characterization of the role played by the state through the clerk of court. While the state has left to the trustee the functions of giving notice and conducting the public auction, the essentials thereof are subject to explicit verification by the clerk under § 45–21.26.[28] Contrary to defendants' characterization, this is not merely an empty ritual: we take the state at its word when it has vested the clerk with *contempt* power to enforce a failure timely to file a complete and correct report.[29] Significantly, the filing of a valid report is a necessary *precondition* to the trustee's power to convey to the highest bidder at the auction. Only *this* filing starts the running of the ten-day period.[30] Only the lapse thereof without intervention—as by an upset bid—empowers the trustee to consummate the sale.

Bald assertions that the trustee's power is self-executing and that the clerk's role is ancillary to consummation are simply belied by the statutes themselves. The state has vested not in the trustee but in the *clerk* the administration of the upset bid provisions, which are set forth in the margin.[31] That § 45–21.27 exists primarily to protect the mortgagor's equity is clear: the intent is to extend to private foreclosure sales an effective equivalent of an equity court's power to decree a resale upon the filing of a substantial raised bid.[32] The statute is by operation of law incor-

---

27. § 45–21.29(k), text at n. 11 *supra.*

28. *See* n. 4 *supra.* The clerk verifies that the sale was conducted by the proper party (see § 45–4 et seq. for provisions regulating succession of powers of sale and substitution of trustees) ; that it was held on "any day except Sunday," § 45–21.3, at the proper place within the situate county, § 45–21.4, commencing and ending within the required times, §§ 45–21.23, 45–21.24 ; that the highest bid was accepted ; and that the report is dated as of the filing. Virtually all information in this report is a necessary predicate to the clerk's administration of the upset bid provisions, discussed *infra.*

29. *See* § 45–21.14 ; Certain-Teed Products Corp. v. Sanders, *supra.*

30. Section 45–21.27 provides :
(a) An upset bid is an advanced, increased, or raised bid whereby any person offers to purchase real property theretofore sold, for an amount exceeding the reported sale price by ten percent (10%) of the first $1000 thereof plus five percent (5%) of any excess above $1000, but in any event with a minimum increase of $25, such increase being deposited in cash, or by certified check or cashier's check satisfactory to the said clerk, with the clerk of the superior court, with whom the report of the sale was filed, within ten days after the filing of such report ; such deposit to be made with the clerk of superior court before the expiration of the tenth day, and if the tenth day shall fall upon a Sunday or holiday, or upon a day in which the office of the clerk is not open for the regular dispatch of its business, the deposit may be made on the day following when said office is open for the regular dispatch of its business. An upset bid need not be in writing, and the timely deposit with the clerk of the required amount, together with an indication to the clerk as to the sale to which it is applicable, is sufficient to constitute the upset bid, subject to the provisions of subsection (b)

(b) The clerk of the superior court may require the person submitting an upset bid *also* to *deposit a cash bond*, or, in lieu thereof at the option of the bidder, a surety bond, approved by the clerk. The amount of such bond shall not exceed the amount of the upset bid less the amount of the required deposit.

(c) The clerk of the superior court may in the order of resale require the highest bidder at a resale had pursuant to an upset bid to deposit with the clerk a cash bond, or, in lieu thereof at the option of the bidder, a surety bond, approved by the clerk. The bond shall be in such amount as the clerk deems adequate, but in no case greater than the amount of the bid of the person being required to furnish the bond.

(d) A compliance bond, such as is provided for by subsections (b) and (c), shall be payable to the State of North Carolina for the use of the parties in interest and shall be conditioned on the principal obligor's compliance with his bid.

31. Text at n. 30 *supra.*

32. Pringle v. Winston-Salem Building & Loan Ass'n, 182 N.C. 316, 108 S.E.2d 914 (1921).

porated into all deeds of trust.[33] The clerk's role thereunder is not merely "ministerial": he has discretion, for example, to require the "increase" bid to be in cash and, in addition, a cash bond up to the full amount of the original bid. On the other hand, the statute is to be liberally construed to give the mortgagor the full benefit of the intended protection.[34] Thus the power to accept or reject a given bid, within the confines of the statute, gives the clerk an important role vis-a-vis the mortgagor's equity: similar to the court of equity in a judicial proceeding, the clerk can make it more or less difficult for a mortgagor or a third party to trigger a resale, depending upon how he exercises the *discretion* conferred upon him.[35]

Where there is no upset bid,[36] as here, the clerk's role is vital. His audit validates, *inter alia*, the trustee's disbursements, including the equity, or lack thereof, which might inure to the mortgagor. Thus, without a showing of personal notice to the *mortgagor* of the property, the disposition of the proceeds of the *sale* must be approved by the clerk. It is the clerk to whom the purchaser must then apply for an eviction order—with ten days' notice to the party in possession, as the defendants hasten to point out. But notice of what? Then the ball game is over—the mortgagor has become, at best, a squatter, at worst, a trespasser. The clerk is not empowered to reopen; the purchaser need only make a formal showing of what already is on file: the exercise of a power of sale, consummation or confirmation thereof, and purchase and payment by him. The "hearing" before the clerk to which plaintiff was summoned would have been of no avail.[37]

33. Foust v. Gate City Savings & Loan Ass'n, 233 N.C. 35, 62 S.E.2d 521 (1950); Huggins v. Dement, 13 N.C.App. 673, 187 S.E.2d 412 (1972), cert. denied, 409 U.S. 1071, 93 S.Ct. 677, 34 L.Ed.2d 659 (1972).

34. Clayton Banking Co. v. Green, 197 N.C. 534, 149 S.E. 689 (1929).

35. *Id.*, 149 S.E. at 690–91.

36. Defendants cite language in state cases to the effect that the statutes confer no "supervisory authority" upon a clerk unless and until an upset bid is filed. *See* Certain-Teed Products Corp. v. Sanders, *supra*; § 45–21.29 (a)–(j), text at n. 6 *supra*. Thus it is argued that absent an upset bid, the clerk's role is by state law at most only ministerial. But *Certain-Teed* was directing its attention to the argument that the clerk must affirmatively "confirm" a sale even in the absence of an upset bid. See n. 25 *supra* for the court's holding. Similarly, cases cited in *Certain-Teed* merely confirm the statutory language: the clerk has no inherent equitable authority to order a resale absent a valid and timely upset bid. *See, e. g.,* Lawrence v. Beck, 185 N.C. 196, 116 S.E. 424 (1923). Furthermore, by failing to assure adequate notice, the defendants prevented the plaintiffs from beneficial use of the upset bid provisions. *See* In re Sharpe's Land, 230 N.C. 412, 53 S.E.2d 302 (1949) (mortgagor's continual use of upset bid provisions to drive price up in successive resales held valid).

37. And equity, that last resort, could have acted at this point, if at all, only upon a showing of "'gross inadequacy of consideration . . . coupled with any other inequitable element . . . .'" Certain-Teed Products Corp. v. Sanders, *supra*, 141 S.E.2d at 337 (citations omitted). N.C.Gen.Stat. § 45–21.34 (Supp.1974) states:
Any owner of real estate, or other person, firm or corporation having a legal or equitable interest therein, may apply to a judge of the superior court, prior to the confirmation of any sale of such real estate by a mortgagee, trustee, commissioner or other person authorized to sell the same, to enjoin such sale or the confirmation thereof, upon the ground that the amount bid or price offered therefor is inadequate and inequitable and will result in irreparable damage to the owner or other interested person, or upon any other legal or equitable ground which the court may deem sufficient: Provided, that the court or judge enjoining such sale or the confirmation thereof, whether by a temporary restraining order or injunction to the hearing, shall, as a condition precedent, require of the plaintiff or applicant such bond or deposit as may be necessary to indemnify and save harmless the mortgagee, trustee, cestui que trust, or other person enjoined and affected thereby against cost, depreciation, interest and other damages, if any, which may result from the granting of such order or injunction: Provided further, that in other re-

Defendants have urged, in effect, that we examine the various elements of the foreclosure proceeding as disparate bits and pieces. But, following the evident legislative purpose, we view the statutory framework as a coherent entity. Before us is a scheme designed at least in part to lower the cost and increase the efficiency of real estate foreclosures.[38] It is, in effect, a streamlined version of a judicial sale, with the clerk exercising by detailed *statutory* authority many of the supervisory powers inherent in a court of equity. While it might be possible to revive the common law power of sale procedure—in which the state arguably played no role—[39] North Carolina has clearly not done so. We hold that the direct participation by the clerk[40] in the procedure by which plaintiff was deprived of ownership, and threatened to be deprived of possession, of her property constituted state action.

## II.

Defendants do not seriously suggest that in the absence of an express waiver the failure to give plaintiff personal notice of the foreclosure sale until after title vested in the purchaser and not until two weeks before she was to be evicted as a trespasser is not vulnerable to a constitutional attack. This failure must be examined over against the principle that

[a]n elementary and fundamental requirement of due process in any pro-

ceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). To satisfy the "[n]otice . . . required before property interests are disturbed, before assessments are made, before penalties are assessed,"[41] defendants rely upon posting at the county courthouse door and an advertisement in a publication which serves "the law profession."[42] To propose to a homeowner that he trek to the courthouse or spend 20 cents to examine fine-print legal notices, *daily* for the duration of a 20-year mortgage, as his sole protection against summary eviction, seems to us to offer him nothing of value. So also it must appear to counsel—for we were told in oral argument that the better practice is to give actual notice.

■ "[W]hen notice is a person's due, process which is a mere gesture is not due process." *Mullane, supra,* 339 U.S. at 315, 70 S.Ct. at 657. Since "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *id.,* at 315, 70 S.Ct. at 657, we hold that, absent express waiver,

---

spects the procedure shall be as is now prescribed by law in cases of injunction and receivership, with the right of appeal to the appellate division from any such order or injunction.

The relief is conditioned on application *prior* to the confirmation (or consummation) of the sale. *Certain-Teed Products Corp. v. Sanders, supra;* Whitford v. North Carolina Joint Stock Land Bank, 207 N.C. 229, 176 S.E. 740 (1934). But without personal notice to the mortgagor, the option of seeking equitable relief was, like that of filing an upset bid, substantially foreclosed.

**38.** *See generally* Note, Power of Sale Foreclosure After Fuentes, 40 U.Chi.L.Rev. 206 (1972).

**39.** *Id.,* at 206–10.

**40.** Since our finding is one of "direct" state action under cases such as *Fuentes* and *Mitchell,* we need not decide whether there was sufficient "indirect" state action to sustain plaintiff's cause of action. *A fortiori* we view the numerous self-help repossession cases (under the Uniform Commercial Code), which have resulted overwhelmingly in "no state action" findings under the "indirect action" theories, as entirely inapposite: no state officials were involved even indirectly in the challenged conduct. For similar reasons, neither *Moose Lodge* nor *Metropolitan Edison* is of any aid to defendants.

**41.** Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957).

**42.** The motto of *The Mecklenburg Times:* "The Times has been serving the law profession for fifty years."

plaintiff [43] was entitled to a good faith attempt to notify her by means reasonably calculated to inform her of imminent foreclosure. Here, plaintiff got no notice, nor was there even the slightest reasonable expectation that the statutory forms of notice would ever come to her attention.

Without question, notice must be coupled with "opportunity for hearing appropriate to the nature of the case." *Id.*, at 313, 70 S.Ct. at 657; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). We recognize that the "formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie, supra,* 401 U.S. at 378, 91 S.Ct. 780 at 786 (footnote omitted). One's home or place of business is usually at stake; it is quite likely the mortgagor's most valuable asset. On the other hand, given the kind of notice required by the fourteenth amendment, the mortgagor will in the future have available both the upset bid provisions and a suit for injunctive relief under § 45–21.34. Furthermore, the issues at any early stage are likely to center on obligation and default, "ordinarily uncomplicated matters that lend themselves to documentary proof . . .." Mitchell v. W. T. Grant Co., 416 U.S. 600, 609, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406 (1974). Under the circumstances, and consistent with the existing statutory scheme, we think at

a minimum due process requires the trustee to make an initial showing before the clerk or similar neutral official that the mortgagor is in default under the obligation; the mortgagor must of course be afforded the opportunity to rebut and defend the charges. *Fuentes, supra,* 407 U.S. at 96–97, 92 S.Ct. 1983.

As to time of hearing, in this kind of case, which presents no extraordinary situation, the mortgagor must "be given an opportunity for a hearing *before* he is deprived of any significant property interest . . .." *Boddie, supra,* 401 U.S. at 379, 91 S.Ct. at 786 (footnote omitted). The right to submit an upset bid is obviously not a hearing. The extraordinary injunctive relief available under § 45–21.34 does not suffice because (1) the burden of proof is clearly on the mortgagor; (2) he most likely must show irreparable damage, as by inadequancy of the bid; and (3) a condition precedent to relief is a bond providing for full indemnification. *See* Fuentes v. Shevin, *supra*; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed. 2d 62 (1965). And at the hearing before the clerk prior to eviction, the mortgagor is presented with a *fait accompli:* the property has been sold, the proceeds distributed, the deed recorded.

Finding the later "hearings" insufficient, and perceiving no countervailing reasons for delay,[44] we hold that a hearing prior to foreclosure and sale is essential. Fuentes v. Shevin, *supra.*

43. Mailing or hand-delivering to mortgagors who reside at or conduct their business on the encumbered property would appear to suffice. Other situations might admit of different solutions. *See* North Carolina Rules of Civil Procedure, § 1A–1 et seq. (Supp. 1974).

44. In Mitchell v. W. T. Grant Co., *supra,* the Court declined to graft a rigid requirement of prior notice and hearing upon the state's procedure for sequestration of installment goods upon the vendor's *ex parte* application. Balancing the seller's risks against the relatively low-risk, short-lived deprivation suffered by the debtor, the Court found that Louisiana

had reached a "constitutional accommodation." 416 U.S. at 610, 94 S.Ct. 1895. Defendants have cited no substantial prejudice which they would suffer here if prior notice were provided, nor, given that foreclosure takes at least approximately 45 days, do we perceive any need to move quickly *before* the mortgagor is notified, as in *Mitchell. See* North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). We have noted Mr. Justice Stewart's short concurrence in *Di-Chem:* "It is gratifying to note that my report of the demise of [*Fuentes*], see Mitchell v. W. T. Grant Co., 416 U.S. 600, 629–636, 94 S.Ct. 1895, 1910–1914, 40 L.Ed.2d 406, seems to

The property rights at issue here were, of course, created by private arrangement. Due process rights of a mortgagor can be bargained away. D. H. Overmyer v. Frick, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); Boddie v. Connecticut, *supra;* National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964). We follow *Overmyer* in declining to hold that North Carolina's foreclosure procedure is *per se* violative of the due process clause. 405 U.S. at 184–88, 92 S.Ct. 775. But since we are not to "presume acquiescence in the loss of fundamental rights," Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937), we hold that defendants are barred by the fourteenth amendment from working a deprivation of the mortgagor's property without prior notice and an opportunity for a timely hearing—unless it is clear that those rights have been expressly waived.

### III.

 Defendants contend that by signing the deed of trust plaintiff waived her procedural due process rights under the standards set out in D. H. Overmyer v. Frick, *supra,* and Fuentes v. Shevin, *supra.* In *Overmyer* the Court held that in the corporate-property-right context of that case, the debtor's waiver by cognovit note was "voluntarily, intelligently, and knowingly" made. *Id.,* 405 U.S. at 187, 92 S.Ct. 775. The facts disclosed neither unequal bargaining power nor a contract of adhesion; both parties were fully aware of the significance of the waiver provisions, and the debtor was counseled. *Fuentes,* on the other hand, dealt with a typical consumer-creditor dispute under a conditional sales contract:

The facts of the present cases are a far cry from those of *Overmyer.* There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

The Court in *Overmyer* observed that "where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the [waiver] provision, other legal consequences may ensue." *Id.,* [405 U.S.] at 188, 92 S.Ct. [775], at 783. Yet, as in *Overmyer,* there is no need in the present cases to canvass those consequences fully. For a waiver of constitutional rights in any context must, at the very *least,* be clear. We need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver.

. . . The contracts included nothing about the waiver of a prior hearing.

*Id.,* 407 U.S. at 95–96, 92 S.Ct. at 2002.

We think *Fuentes* applies here. The purported waiver of due process rights was contained in a paragraph [45] which, like most of the language of the deed of trust, was printed in minute, 8-point type. Defendants have made no showing that plaintiff was actually aware [46] or made aware of the legal significance of

---

have been greatly exaggerated." 419 U.S. at 608, 95 S.Ct. at 723.

45. See n. 24 *supra* for the operative language.

46. At the May 5, 1973, hearing plaintiff testified that she knew that if she didn't make the payments "they could take" the property. Tr. at 34. But the knowledge that she was behind in her payments as to property that

was encumbered does not, by itself, show "full awareness of the legal consequences," or knowledge of when and how the creditor would proceed. *Overmyer, supra,* 405 U.S. at 187, 92 S.Ct. at 783. Since she had not, as we view the deed of trust, waived her due process rights, she still had a right to be informed that Dixie had declared default and

that language. Nor, as in *Fuentes,* does the deed of trust even allude to the right to a prior hearing. Plaintiff cannot be found to have waived a right which is not disclosed on the face of the contract.

Thus, while plaintiff's signature must, of course, be taken as a knowing agreement to encumber her property as security for the underlying debt, the language in the deed of trust does not constitute a waiver of the constitutional protections which, we hold, accompany foreclosure. "Courts indulge every reasonable presumption against waiver." Aetna Insurance Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937) (footnote omitted).

## RELIEF

■■ This is not a class action. Presumably Blackburn's interest is identical to that of the other 99 clerks of superior court, but their interests are not represented by him nor are they joined. To enjoin the clerk of *one* of 100 counties is unseemly and, we think, unnecessary. County and state officers of North Carolina are not, and never have been, indifferent to the commands of the Constitution as interpreted and applied by either state or federal courts. *Stare decisis* in a state dedicated to the rule of law can be as effective, we think, as injunction.

As to the state's interest in the litigation, as represented by Blackburn, we will enter a judgment declaring that the statutes are not *per se* unconstitutional, but are unconstitutional as applied; that foreclosure and sale pursuant to the statutory scheme is prospectively unlawful and void unless (a) the power of sale is determined by the clerk to be a knowing, voluntary, and intelligent waiver of the fourteenth amendment due process rights, or (b) the clerk determines there has been adequate and timely notice to the mortgagor coupled with opportunity for a hearing before any rights are lost.

As to specific relief for Turner, an injunction will issue requiring that Watts convey title to her upon her execution of a note (secured by mortgage to him) in the amount of the indebtedness on the property discharged by Watts with interest at six percent, less payments made by Turner to Watts pursuant to Judge McMillan's preliminary injunction. Since the aborted foreclosure and sale violated the fourteenth amendment rights of Turner, it would be unjust and inequitable to require that she pay the expenses of those proceedings.

Costs will be taxed against the defendants.

We request that counsel for plaintiff prepare and submit to opposing counsel and the court an appropriate judgment.

WOODROW WILSON JONES, Chief District Judge (dissenting):

Since I firmly believe that the Complaint fails to state a cause of action over which this court has jurisdiction and that the action should therefore be dismissed, I respectfully dissent.

It must be remembered that the plaintiff brought this action under the provisions of 42 U.S.C.A. § 1983 alleging that the defendants deprived her of her property rights without due process of law by failing to provide her with proper notice of a foreclosure sale under a deed of trust which she had signed. She asserts that this court has jurisdiction of her action under 28 U.S.C.A. § 1343 (3). It is necessary that we examine these statutes in the light of the facts of this case.

Section 1983 was enacted by the Congress shortly after the adoption of the Fourteenth Amendment and is founded solely upon its provisions. The Fourteenth Amendment is a prohibition against certain types of conduct by a State. It declares that no State shall deprive any person of life, liberty, or property without due process of law. Individual invasion of individual rights is not the subject matter of the amendment. It nullifies all State action and State laws

---

that the trustee had instituted his foreclosure remedy—if only to enable her to attempt re-

financing to save her home before it was too late.

which impair the privileges and immunities of citizens of the United States or which injures them in life, liberty, or property without due process of law. It empowered Congress to pass legislation to enforce the amendment but it does not authorize Congress to create a code of municipal or state law for the regulation of private rights. It authorizes the Congress to provide modes of redress against the operation of State laws and the action of State officers when these rights are abridged.

For the plaintiff to invoke the Fourteenth Amendment here she must establish that her rights have been impaired by the State of North Carolina. Section 1983 is inapplicable unless the defendants have acted "under color of" state law, custom, or usage. In other words, the plaintiff must show State action in order to maintain this action and to give this court jurisdiction.

As Justice Rehnquist said in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974):

"The Due Process Clause of the Fourteenth Amendment provides 'nor shall any State deprive any person of life, liberty, or property, without due process of law.' In 1883, this Court in The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, affirmed the essential dichotomy set forth in that Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, 'however discriminatory and wrongful,' against which the Fourteenth Amendment offers no shield. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

"We have reiterated that distinction on more than one occasion since then. See, e. g., Evans v. Abney, 396 U.S. 435, 445, 90 S.Ct. 628, 633, 24 L.Ed.2d 634 (1970); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 171–179, 92 S.Ct. 1965, 1970–1974, 32 L.Ed.2d 627 (1972). While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer. Burton v. Wilmington Parking Authority, 365 U.S. 715, 723, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); Moose Lodge No. 107, v. Irvis, *supra,* 407 U.S. at 172, 92 S.Ct. [1965] at 1971."

Thus, the plaintiff has the burden of showing that State action was involved in the loss of her property rights. In the case of Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the court held that State action could not be found unless the State had "significantly involved" itself with the challenged conduct. Thus, the question of the involvement of the State of North Carolina in the foreclosure of the plaintiff's property under the challenged statute must be considered with this "significantly involved" concept in mind.

Here, the plaintiff, Stella Turner, and Piedmont Pacific Lumber Company entered into an agreement whereby the Company sold and delivered to her and thereafter affixed to her house aluminum siding for the sum of $4,543.53. Mrs. Turner agreed to pay the sum in monthly installments which were secured by a second deed of trust on her property. Under North Carolina law the parties could elect to use a mortgage or deed of trust with or without a power of sale in the event of default. The procedure for the foreclosure of a mortgage or deed of trust containing no power of sale is by a civil action with summons being served upon the defaulting party and with a full trial, including a jury trial. The sale is then conducted under orders of the Superior Court. If the instrument selected by the parties contains a power of sale the foreclosure procedure would be in accordance with the agreement of the parties. The parties here selected a deed of trust containing a power of sale and no state officer had anything to do with such selection. The parties agreed

that in the event of default in the payment of the monthly installments the Trustee would, upon the demand of the third party, proceed to sell the property at public auction at the front door of the Courthouse of Mecklenburg County after giving the notice required by the law of North Carolina. Default occurred and the holder of the note, Dixie Acceptance Corporation, demanded of the Trustee, Charles D. Gray, III, to foreclose. He prepared, posted and published a notice of sale as required by the deed of trust and the statute. No contact is made with any state office or officer until after the public auction. The statute then requires that within five days after the public sale the Trustee shall file a written report in the Clerk's office showing among other things, the date of sale, the highest bid, and the bidder. If there is no increased bid filed within ten days from the date of the report, the Clerk has nothing further to do with the sale except to receive and audit an accounting of the Trustee.

If the above ministerial acts of the Clerk of Superior Court are sufficient to constitute state action so as to confer jurisdiction upon a federal court, is it not logical to assume that all disputes over property in the nation would come under federal scrutiny merely because the deeds and mortgages are required to be recorded under state law and are actually recorded by state officers? I do not believe Congress intended to confer such wide jurisdiction upon the federal courts.

The plaintiff contends that if the part played by the Clerk in the foreclosure proceeding is not sufficient to constitute state action, then the "Notice and Order of Service" issued by the Clerk upon the petition for Application for a Writ of Assistance and Possession filed by the purchaser is state action and confers jurisdiction upon this Court. Surely, Congress did not intend that all litigation between private parties automatically involves state action so as to confer jurisdiction upon federal courts under the Civil Rights Act merely because the

action is filed under state law and is before a state judge with process being served by a County Sheriff. If this is the law, then we will need a federal judge in every town and hamlet in the land to handle all the federal cases which will arise.

There is no reason why the plaintiff could not raise the constitutional issue in the state court action now pending between the parties. She was served with process in the state court action and had until April 11, 1973 in which to answer or otherwise plead. Instead of proceeding in the state court action, she filed this 1983 action on March 27, 1973 and sought and obtained from Judge McMillan a preliminary injunction restraining further action in the state court proceeding. The question of lack of notice of the foreclosure proceeding raises a constitutional issue which must be determined, but it can be determined in the state action already pending. There is no reason to believe that the state courts would not follow the recent due process decisions of the United States Supreme Court.