PARAMOUNT PICTURES CORPORATION v MISKINIS

Docket No. 67943. Argued May 3, 1983 (Calendar No. 4).—Decided March 19, 1984.

Paramount Pictures Corporation and other motion picture distributors brought an action in the Oakland Circuit Court against Joseph Miskinis, the Oak Drive-In Theatre, and the Civic Theatre, motion picture exhibitors, alleging breach of licensing agreements in failing to produce business records for examination and the submission of false and incomplete statements of gross receipts of the defendants' theaters. The court, Robert B. Webster, J., granted the plaintiffs' motion for production of documents. The Court of Appeals, V. J. Brennan, P.J., and N. J. Kaufman and Borradaile, JJ., affirmed in an unpublished opinion per curiam (Docket No. 53143). The defendants appeal, claiming that the compelled production of their business records and books violates their privilege against self-incrimination.

In an opinion by Justice Boyle, joined by Chief Justice Williams and Justices Ryan and Brickley, the Supreme Court held:

The compelled production of corporate and partnership records and books in a civil action does not violate the privilege against self-incrimination under either the federal or the state constitution.

1. The Fifth Amendment privilege against self-incrimination is personal and cannot be asserted in behalf of another. The privilege applies only to natural persons and cannot be used by or on behalf of an organization. Thus, the custodian of the

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 16A Am Jur 2d, Constitutional Law § 603.

[1, 2, 4, 6] 81 Am Jur 2d, Witnesses §§ 47, 48.

[1] 23 Am Jur 2d, Depositions and Discovery § 38.

[2, 3] Right of member, officer, agent, or director of private corporation or unincorporated association to assert personal privilege against self-incrimination with respect to production of corporate books or records. 52 ALR3d 636.

[4, 5] 81 Am Jur 2d, Witnesses § 31.

books and records of an organization cannot refuse to produce the documents even if the documents might be personally incriminating to the custodian. An organization's inability to rely on the privilege against self-incrimination does not depend solely on the state's visitatorial powers, but rather on the inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records.

2. Production of business records and books may be compelled without violating the privilege against self-incrimination where the documents are those of a corporation or of an organization which has established an institutional identity recognized as an entity apart from its members rather than those of a person and the custodian holds the documents in a representative, rather than a personal, capacity.

3. A three-step inquiry determines whether compelled production of an organization's documents is prohibited by the Fifth Amendment:

    a. Are the documents the records of the organization rather than those of the individual who has possession of them?

    b. Does the custodian hold the records in a representative, rather than a personal, capacity?

    c. If the organization is not a corporation, does it have an established institutional identity which is recognized as an entity apart from its individual members?

In this case there is no assertion that the documents in question are the personal documents of Miskinis, the individual asserting the privilege, or that he holds them in a personal capacity. Therefore, production of documents of the corporate defendant, the Oak Drive-In Theatre Company, is not prohibited by the Fifth Amendment. The facts show that the partnership, the Civic Theatre Company, has an identity independent of its individual members. Most persuasive is the fact that Miskinis pleaded the partnership as a bar to his personal liability. On the facts, production of documents of the partnership may also be compelled.

4. The guarantee against compelled self-incrimination in the state constitution is the same as that in the federal constitution, and the Court declines to construe it more liberally on these facts. The addition of a provision in the state constitution for fair and just treatment was intended to guarantee fair and just treatment of persons in legislative and executive investiga-

tions, not to modify the scope of the privilege against self-incrimination.

5. The question of contractual waiver was never raised by the parties and was neither briefed nor argued before the Supreme Court. The minority has noted no authority for the proposition that the Court may resolve a case on the basis of an issue not raised by the parties in order to avoid resolution of a constitutional issue. Where it appears that there may be a cognizable response to an issue, the preferable course of action is to remand the case to the trial court for resolution.

Justice Levin, joined by Justices Kavanagh and Cavanagh, concurring, agreed that the Fifth Amendment privilege against self-incrimination does not apply to the compelled disclosure of corporate and partnership documents held in a representative capacity, the documents sought in this case. They also agreed that disclosure may be compelled despite the state privilege against self-incrimination, but for a different reason. The state privilege in this case was waived in contracts between the plaintiffs and the defendants, and it is therefore not necessary to reach the question whether a "corporate documents" exception to the state privilege should be adopted. The "corporate documents" exception to the Fifth Amendment privilege is a fluid doctrine which they are not prepared to adopt as the measure of the state privilege. Historically, the state privilege, which should be liberally construed, has been viewed as applying to corporate documents. The importance of not adopting the decisions of the United States Supreme Court concerning the Fifth Amendment privilege as the measure of the state privilege without independent consideration is underscored by a recent decision of the Supreme Court of the United States that has the effect of allowing the production of a person's private diaries to be compelled when their contents, but not the act of producing them, incriminate that person.

Affirmed.

### . Opinion of the Court

1. CONSTITUTIONAL LAW — SELF-INCRIMINATION — BUSINESS ORGANIZATIONS — CUSTODIANS OF RECORDS.

   The compelled production of the records and books of an organization in a civil action is not prevented by the privilege against self-incrimination under either the federal or the state constitution (US Const, Am V; Const 1963, art 1, § 17).

2. CONSTITUTIONAL LAW — SELF-INCRIMINATION — BUSINESS ORGANIZATIONS — CUSTODIANS OF RECORDS.

   The privilege against self-incrimination is personal and applies

only to natural persons; it cannot be asserted in behalf of another, nor used in behalf of an organization; thus, the custodian of the books and records of an organization cannot refuse to produce the documents even if the documents might be personally incriminating to the custodian (US Const, Am V; Const 1963, art 1, § 17).

3. CONSTITUTIONAL LAW — SELF-INCRIMINATION — BUSINESS ORGANIZATIONS.

Production of business records and books may be compelled without violating the privilege against self-incrimination where the documents are those of a corporation or an organization which has established an institutional identity recognized as an entity apart from its members rather than those of a person and the custodian holds the documents in a representative, rather than a personal, capacity (US Const, Am V; Const 1963, art 1, § 17).

4. CONSTITUTIONAL LAW — SELF-INCRIMINATION — STATE CONSTITUTION — CONSTRUCTION.

The state constitutional privilege against self-incrimination does not require a different or more liberal interpretation than that of the federal constitution (US Const, Am V; Const 1963, art 1, § 17).

5. CONSTITUTIONAL LAW — SELF-INCRIMINATION — STATE CONSTITUTION — CONSTRUCTION.

The addition to the self-incrimination clause of the state constitution of a provision for fair and just treatment of persons and organizations in legislative and executive investigations was not intended to modify the privilege against self-incrimination (Const 1963, art 1, § 17).

CONCURRING OPINION BY LEVIN, J.

6. CONSTITUTIONAL LAW — SELF-INCRIMINATION — WAIVER — CONTRACTS.

*The state constitutional right against self-incrimination of the custodian of documents of a corporation or partnership may be waived by contract so as to require the custodian to produce those documents where the contract reasonably reserves to one party the right to inspect the documents of another that pertain to the agreement (Const 1963, art 1, § 17).*

*Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *Dennis B. Schultz),* for the plaintiffs.

*Arthur J. Hass* for the defendants.

BOYLE, J. The issue raised by this appeal is whether Joseph Miskinis, Jr., as custodian of corporate and partnership books and records, can withhold production of those documents in a civil action on the ground that there is a possibility that the documents will be personally incriminating to him, thus raising the privilege against self-incrimination protected by the Michigan and United States Constitutions, Const 1963, art 1, § 17 and US Const, Am V.

## I. FACTS

Plaintiffs-appellees are foreign corporations which have been or are engaged in the business of licensing theater owners and operators to exhibit motion picture films distributed by them. Defendants-appellants owned and operated two motion picture theaters in Detroit and Royal Oak, one a partnership, and the other a Michigan corporation.

Defendant movie theater entities entered into licensing agreements with plaintiff distributors which required the defendants to pay the distributors a percentage of the theaters' gross receipts of the admission prices collected at the box office in exchange for the right to exhibit plaintiffs' films. The agreements further provided that the distributors' share of the proceeds was to be held in trust by the exhibitors for the distributors in a separate and distinct fund. Defendants were contractually obligated to prepare and submit to plaintiffs daily statements of the gross receipts derived from the exhibition of the films and to keep and preserve for at least four years full and accurate books and records. Plaintiffs contractually reserved the right

to audit the defendants' books and records at any time.

Plaintiffs used a spot-checking system to verify the accuracy of defendants' reports. This checking system revealed discrepancies between the amount of gross receipts shown on the written statements prepared and submitted by defendants and the amount shown by the checking system. As a result, plaintiffs made a written request to examine defendants' business records. Defendants refused to honor the request, and plaintiffs commenced this action.

The original complaint was filed against "Joseph Miskinis d/b/a Oak Drive-In Theatre and Civic Theatre". Counts I and III set out causes of action for breach of contract by failing to produce for examination the relevant business records, by submitting false and incorrect statements of gross receipts, and by submitting statements of gross receipts which did not fully and completely disclose the gross receipts. Count II of the original complaint was a claim for intentional misrepresentation.

In his answer to the original complaint defendant Joseph Miskinis, Jr., denied being the sole owner of the theaters in question and answered that the Oak Drive-In was owned by a Michigan corporation, that the Civic Theatre was owned by a Michigan partnership, and that the defendant had a minority interest in each entity. Plaintiffs subsequently moved to add parties defendant. The motion was granted, and plaintiffs filed an amended complaint naming as defendants the Oak Drive-In Theatre and the Civic Theatre in addition to Joseph Miskinis.

During the course of discovery plaintiffs moved the trial court for an order requiring defendants to

produce their business books and records for examination. Defendants raised the privilege against self-incrimination in opposition to this motion.[1] The trial court granted plaintiffs' motion, but limited the scope of discoverable documents to those pertaining to the defendants' theater operations from January 1, 1976, to December 31, 1978. The court further ordered "that neither the plaintiffs nor their agents, employees, or independent contractors who perform the copying and examination of the aforesaid books, documents, and records shall disclose the information obtained from those books, documents, and records during such copying and examination to anyone except plaintiffs' legal counsel or this court."

Defendants sought leave to appeal to the Court of Appeals, which was granted. The Court affirmed the judgment of the lower court in an unpublished per curiam opinion. The Court of Appeals rejected defendants' claim that the production of documents was protected by the privilege against self-incrimination, Const 1963, art 1, § 17; US Const, Am V. Reasoning that the privilege against self-incrimination applies only to natural persons and that a corporation, a creature of the state, could not assert the privilege to avoid the production of its records, the Court of Appeals held that production was justified because the records were those of a particular corporation as opposed to the personal records of any individual. The officer of the corporation in possession of corporate books could not assert his own privilege against self-incrimination to prevent their disclosure inasmuch as he only held the records pursuant to his duty to the corpo-

---

[1] Because defendant Joseph Miskinis was the only named defendant at the time his objections to plaintiffs' motion for production of documents were filed, this Court assumes that he raised this issue only as to himself and not as to the corporation and partnership.

ration, unless the materials were his own personal records. This reasoning was also found to be applicable to a partnership. The Court of Appeals modified the trial court's order to the extent that it could be read as requiring production of Joseph Miskinis' personal tax returns if they should be found by the trial court to be personally incriminating to the individual defendant.

This Court granted defendants' application for leave to appeal. 414 Mich 868 (1982). We affirm the decision of the Court of Appeals.

## II. FEDERAL CONSTITUTIONAL PROVISION: AMENDMENT V

We begin our analysis with an examination of the Fifth Amendment of the United States Constitution[2] to determine whether federal constitutional law prohibits the compelled production of the documents at issue in this case. The Fifth Amendment privilege against self-incrimination is a personal privilege and cannot be asserted on behalf of another. The privilege applies only to natural persons and thus cannot be utilized by or on behalf of any organization, such as a corporation. *United States v White,* 322 US 694; 64 S Ct 1248; 88 L Ed 1542 (1944); *Hale v Henkel,* 201 US 43; 26 S Ct 370; 50 L Ed 652 (1906).

The United States Supreme Court has repeatedly held that the custodian of an organization's books and records cannot refuse to produce the documents even if they might be personally incriminating to the custodian. In *Wilson v United States,* 221 US 361; 31 S Ct 538; 55 L Ed 771 (1911), the Court upheld the contempt conviction

---

[2] "No person * * * shall be compelled in any Criminal Case to be a witness against himself."

of Wilson, president of the United Wireless Tele-graph Company, for his refusal to obey a grand jury subpoena duces tecum requiring the produc-tion of the corporation's letter-press copy books. The Court focused on the nature of the documents as the books of the corporation and on the capacity in which they were held, despite the fact that Wilson himself had written many of the business entries in his capacity as executive officer of the corporation. The *Wilson* Court reasoned that be-cause of the corporate form of business activity, with its chartered privileges, the corporation could not refuse the government's demand to examine books when that demand is expressed in lawful process and is reasonable under the circumstances. "This is involved in the reservation of the visitato-rial power of the state, and in the authority of the National Government where the corporate activi-ties are in the domain subject to the powers of Congress." *Wilson,* p 382. See also *Hale v Henkel, supra,* pp 74-75. The reserved power of visitation would be defeated if "guilty officers could refuse inspection of the records and papers of the corpo-ration", and it was held that the visitatorial power which existed with respect to the corporation nec-essarily reached the corporate books regardless of the conduct of the custodian.

While the Court's reasoning in *Wilson* could fairly be read as applying only to the production of corporate documents, subsequent decisions of the Court make clear that production of documents of other types of organizations may be compelled against Fifth Amendment objections. In *United States v White,* 322 US 694; 64 S Ct 1248; 88 L Ed 1542 (1944), it was held that an "assistant supervi-sor" of an unincorporated labor union who had

possession[3] of books subpoenaed by a federal grand jury could not refuse to produce the documents even though they might have tended to incriminate the union and himself personally. The Court held that individuals, when acting as representatives of a collective group, are not exercising their personal rights, duties, and privileges, but rather assume the rights, duties, and privileges of the entity of which they are agents or officers and are bound by its obligations. The Court explained:

"The reason underlying the restriction of this constitutional privilege to natural individuals acting in their own private capacity is clear. The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand that the constitutional power of the federal and state governments to regulate those activities be correspondingly effective. The greater portion of evidence of wrongdoing by an organization or its representatives is usually to be found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible. See *Hale v Henkel, supra,* 70, 74; 8 Wigmore on Evidence (3d ed), § 2259a. The framers of the constitutional guarantee against compulsory self-disclosure, who were interested primarily in protecting individual civil liberties, cannot be said to have intended the privilege to be available to protect economic or other interests of such organizations so as to nullify appropriate governmental regulations." *White,* p 700.

Most relevant to our present analysis is the Court's reasoning that an association's inability to rely on the privilege against self-incrimination

---

[3] The subpoena was served on the union president. The assistant supervisor was not the authorized custodian of the union's books, but had possession of the books demanded.

does not depend solely on the fact that the state charters corporations and retains visitatorial powers over them,[4] but rather on the "inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records". *White,* pp 700-701. The Court articulated the following standard:

"The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only. If so, the privilege cannot be invoked on behalf of the organization or its representatives in their official capacity." *White,* p 701.

*Bellis v United States,* 417 US 85; 94 S Ct 2179; 40 L Ed 2d 678 (1974), dispels any suggestion that the *White* test depends solely on the size of the organization. Bellis had been one of the three partners of the law firm Bellis, Kolsby & Wolf. After he left the firm to join another law firm, the partnership was dissolved, and the other two partners formed a new partnership. Almost four years after the dissolution of the earlier partnership, Bellis was served with a subpoena directing him to appear before a grand jury and to bring the partnership records that were in his possession. Bellis asserted his Fifth Amendment privilege as a basis

[4] See also *Bellis v United States,* 417 US 85, 89; 94 S Ct 2179; 40 L Ed 2d 678 (1974).

for refusing production of the records, and he was held in contempt.

In *Bellis* the Supreme Court reasoned that the "organized, institutional activity" language used in *United States v White, supra,* "presupposes the existence of an organization which is recognized as an independent entity apart from its individual members" that "must maintain a distinct set of organizational records, and recognize rights in its members of control and access to them". The subpoenaed records must in fact be organizational records held in a representative capacity, and it must be fair to say that the records demanded are the records of the organization rather than those of the individual. *Bellis, supra,* pp 92-93.

The Court held that partnerships could represent organized institutional activity so as to preclude any claim of Fifth Amendment privilege with respect to the partnership's financial records. With respect to the small size of the partnership,[5] the Court found that the partnership had an established institutional identity independent of its individual members observing, among other things,[6] that the firm held itself out to third parties as an entity with an independent existence. The Court flatly rejected any suggestion that the Court's formulation in *White, supra,* could be reduced to a simple proposition based solely upon the size of the organization. The Court found that Bellis held the subpoenaed partnership records in a representative capacity.

[5] *Bellis* involved a three-person partnership, the same size as the Civic Theatre Company partnership involved in this case.

[6] The Court also cited the 15-year continuing existence of the firm, a bank account maintained in the partnership name, the use of stationery with the firm's name on the letterhead, the firm's employment of six persons in addition to the three partners, including two lawyers who practiced law on behalf of the firm, and the firm's filing of separate partnership federal tax returns.

From the federal precedent discussed above we distill a three-step inquiry for determining whether the Fifth Amendment privilege against self-incrimination prohibits the compelled production of an organization's documents:

1. Are the documents the records of the organization rather than those of the individual who has possession of them?

2. Does the custodian hold the records in a representative, rather than a personal, capacity?

Assuming affirmative answers, in the case of a corporation the inquiry is ended because of the special nature of the corporate form and the state's reservation of visitatorial powers over corporations. See *Bellis v United States, supra; United States v White, supra; Grant v United States,* 227 US 74; 33 S Ct 190; 57 L Ed 423 (1913); *Wilson v United States,* 221 US 361, 382; 31 S Ct 538; 55 L Ed 771 (1911). In the case of non-corporate organizations, however, a third question arises:

3. Does the organization have an established institutional identity which is recognized as an entity apart from its individual members?

With respect to the first question, *i.e.,* the identity of the documents, we note that there has been no assertion by defendants that the documents for which production was compelled are the personal documents of Joseph Miskinis, Jr., the individual asserting the privilege. The trial court's order,[7] as

---

[7] The trial court ordered that the defendants produce for copying and examination by plaintiffs the following documents "pertaining to the defendants' operation of the Civic Theatre and Oak Drive-In Theatre for the period of January 1, 1976, through December 31, 1978 * * *:

"1. All records of ticket sales;

"2. All cash receipts, journals and ledgers in which the proceeds of ticket and concession sales are recorded;

"3. All bank account statements and deposit receipts for proceeds derived from ticket and concession sales;

modified by the Court of Appeals,[8] required the production of corporate and partnership records only.

Nor is there any argument that Joseph Miskinis, Jr., holds these records in a personal capacity. In their answers to interrogatories and in their brief in support of this appeal, defendants admit that

"4. All books, records, and documents showing the computation and payment of license fees to plaintiffs and other distributors;

"5. All records prepared by the individual employees of defendants showing their respective daily ticket sales;

"6. All records and documents pertaining to the purchase of tickets by defendants for sale to their customers;

"7. All federal, state, and local tax returns on which the proceeds from ticket and concession sales were reported;

"8. All reports to federal, state, and local governmental agencies pertaining to ticket and concession sales;

"9. The general ledger for each theater;

"10. All daily box office statements and reports;

"11. All booking sheets and reports;

"12. All unused tickets; and

"13. All admission returns and records."

It further provided "that neither the plaintiffs nor their agents, employees, or independent contractors who perform the copying and examination of the aforesaid books, documents, and records shall disclose the information obtained from those books, documents, and records during such copying and examination to anyone except plaintiffs' legal counsel or this court".

[8] The Court of Appeals modified the discovery order as follows:

"To the extent the trial court's discovery order includes corporate and partnership records, these principles require that it be affirmed. Defendant Miskinis's personal right against self-incrimination has no application to those documents, inasmuch as he holds them as corporate officer and/or partner. Our reading of the discovery order leaves us with the impression that all of the requested records fit within this holding. Nonetheless, it is conceivable that item #7, requiring production of 'Federal, state, and local tax returns on which the proceeds from ticket and concession sales were reported', could include defendant Miskinis's personal tax returns, as opposed to just those of the corporation and partnership. Should the order turn out to cover personal tax returns and should defendant Miskinis be convinced that such returns contain incriminating information, Miskinis may present the returns to the trial court to determine whether that is the case. The trial court, upon determining that such returns are incriminating personal records, shall delete any incriminating portions and permit plaintiffs to examine and copy the remaining parts to the extent they are pertinent to this lawsuit."

Joseph Miskinis, Jr., had possession of the records of the partnership and corporation.[9] Thus, regardless of whether he held these documents as the official or authorized custodian of the corporate and partnership records, since he had possession of all of the desired documents, Miskinis must be deemed, for purposes of this litigation, to be holding the records on behalf of the organization. See *United States v White, supra,* and fn 3 *supra.* Otherwise, an organization could shield itself from the compulsory production of documents merely by the expedient of dividing possession of the documents among more than one of its members, none of whom is regarded as the official custodian of records.

Our finding that the documents are corporate documents held by Joseph Miskinis, Jr., in a representative capacity makes unnecessary any further analysis with respect to the documents of the corporate defendant, Oak Drive-In Theatre Company. We hold that the production of these documents is not prohibited by the Fifth Amendment.

With respect to the documents of the partnership Civic Theatre Company, however, our analysis does not end here, and we must determine whether the partnership has an established institutional identity which is recognized as an entity apart from its individual members. We find that it does have such an independent identity.

Defendants argue that plaintiffs always dealt with defendants as if they were dealing solely with Joseph Miskinis, Jr., and that this action was initially commenced solely against him. The test for determining whether an entity had an indepen-

---

[9] Defendants admit that Joseph Miskinis, Jr., has possession of all of the partnership's records, but it is not clear whether he has all of the corporation's records.

dent identity for Fifth Amendment purposes, however, is not the knowledge of the plaintiffs, but rather how the defendants were perceived by the public at large and whether the organization held itself out to third parties as an entity with an independent existence. See text accompanying fn 6.

In support of our finding we rely upon the fact that the Civic Theatre Company maintained separate partnership records and had a separate bank account. *Bellis, supra.* The Civic Theatre employed more than one hundred temporary employees during the four-year period of 1977 to 1980. Most persuasive, however, is the fact that at the commencement of this litigation the individual defendant asserted the partnership structure of the Civic Theatre as a bar to his personal liability. Indeed, he answered the original complaint by stating that he owned only a minority interest in both business entities, thereby relying upon the separate partnership identity of the Civic Theatre Company to avoid personal liability. Having done so, it is proper to permit all of the parties to rely on the existence of the partnership.

Defendants have repeatedly argued in support of the Fifth Amendment privilege that the plaintiffs always believed that they were dealing exclusively with Joseph Miskinis, Jr.[10] This argument and the

---

[10] We note that the original complaint named "Joseph Miskinis d/b/a Oak Drive-In Theatre and Civic Theatre" as the defendant, and names only "Joseph Miskinis" throughout the complaint. Thus, it is not clear whether the plaintiffs were naming as the original defendant Joseph Miskinis, Sr., or Joseph Miskinis, Jr. The complaint was answered by Joseph Miskinis, Jr. However, the notice of death of defendant filed in this case reads:

"Notice is hereby given that Joseph Miskinis, Senior, one of the partners who owned and operated the Civic Theatre, *and the defendant in this case,* died on November 17, 1979, leaving the sole surviving partner, Joseph Miskinis, Junior.

"By virtue of the partnership Memorandum, dated January 2, 1941,

facts of this case would lead to the incongruous result that the business was identified with Joseph Miskinis, Jr., a minority interest owner, and that the owners of the majority interest were not even identified as the individuals who comprised the business. The logical result of defendants' argument would be that the minority owner could assert his privilege against self-incrimination because he was known to plaintiffs, but that the owners of the majority interest could not assert this privilege to protect the production of records because their ownership interest was unknown, leaving unprotected those against whom the documents would probably be most incriminating.

Hence, adopting defendants' reasoning would require reformulating the relevant inquiry. The issue would turn not on the objective reality of the business relationship, but rather on how the relationship was subjectively perceived. The availability of the Fifth Amendment privilege would rest then on ad hoc determinations which would make the privilege available to certain members of an organization with respect to some parties and not with respect to others.

Moreover, we find that the existence of "secret" or unknown partners supports a finding of an established institutional identity apart from the individual members. Obviously, the unknown partners have no individual identity with respect to the business operations to confer upon the organization.

We are mindful of the following language in *Bellis v United States, supra,* 417 US 101, relied upon by defendants:

the death of either partner dissolved the partnership." (Emphasis added.)

It appears that defendants have taken inconsistent positions with respect to whom they consider to be the individual defendant.

"This might be a different case if it involved a small family partnership, see *United States v Slutsky,* 352 F Supp 1105 (SD NY, 1972); *In re Subpoena Duces Tecum,* 81 F Supp [418, 421 (ND Cal, 1948)], or, as the Solicitor General suggests, * * * if there were some other preexisting relationship of confidentiality among the partners."

Having examined the cases cited, we conclude that the language merely was meant to restate that the papers required to be produced must not be the private and personal papers of the individuals held in a personal capacity. While this is a "family" partnership, we read the Court's use of this word to denote a partnership so small and informal that the partnership's records and papers are inseparable from the personal and private papers of its members. Such is not the case here.

Accordingly, we hold that the compelled production of the corporate and partnership records and books does not violate the Fifth Amendment privilege against self-incrimination.

## III. MICHIGAN CONSTITUTIONAL PROVISION: ARTICLE 1, SECTION 17

Defendants argue alternatively that even if production of the records and books is not protected under the federal constitution, it is protected under the Michigan Constitution, Const 1963, art 1, § 17, which provides:

"Sec. 17. No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

Plaintiffs respond that the Michigan constitu-

tional provision is identical to the federal provision and has been treated similarly by this Court. The precedents relied upon by defendants are distinguishable on the ground that they involve disclosures in the context of criminal proceedings. Plaintiffs argue that public policy does not warrant an application of the Michigan Constitution disparate from that of the United States Constitution and that to adopt the principles urged by defendants would result in the establishment of imponderable barriers to effective civil discovery.

Having examined prior decisions of this Court, we find nothing which requires an interpretation of our constitutional privilege against self-incrimination different from that of the United States Constitution. "The provision in each Constitution is the same." *In re Moser,* 138 Mich 302, 305; 101 NW 588 (1904).

Initially we note that our holding does not depend on the fact that all of the precedent relied upon by defendants involves cases where production was required in a criminal proceeding, as plaintiffs suggest. The constitutional privilege against self-incrimination applies to evidence in a civil proceeding which might subject the witness to criminal prosecution. *Berney v Volk,* 341 Mich 647, 651; 67 NW2d 801 (1955).

This Court has previously addressed the issue of the production of corporate documents in two cases. In *In re Moser, supra,* a grand jury investigating corruption among municipal officers subpoenaed the books and records of the company of which Moser was president. Moser had possession of the subpoenaed books and records. He refused to produce the books, but not for the reason that they would incriminate him.[11] Moser was convicted

---

[11] In fact, Moser repeatedly stated to the grand jury that the books

of contempt of court. His conviction was affirmed by this Court. Noting that the documents could not have been incriminating to Moser since he was not associated with the corporation during the relevant time period, this Court found that the sole basis for the petitioner's refusal to produce the books was his desire to protect the officers of the corporation during the time under investigation. The Court stated the rule thus:

"We think the rule is this: *One cannot be compelled to produce his own books, or the books of another, which are under his control as agent or otherwise, where their production would tend to criminate him; neither can his clerk, whose possession is his possession, be required to produce them;* but when, as the agent of another, he chooses to make entries on the books of that other, and those books are in the actual and legal possession and control of another officer of the corporation, or of the corporation itself, such officer may be compelled to produce them, in a proper case, under a subpoena duces tecum." (Emphasis added.) *In re Moser,* pp 314-315.

*St John v General Motors Corp,* 308 Mich 333; 13 NW2d 840 (1944), was a civil action commenced by 28 female employees of the defendant to recover the difference between wages paid them and those paid to male employees engaged in similar employment. The plaintiffs sought the defendant's employment records by subpoena duces tecum, and the defendant objected to the introduction at trial of the records on the ground of self-incrimination because the alleged wage discrimination was a misdemeanor.

The *St John* Court, p 337, cited *Moser* for the proposition that "the privilege against self-incrimi-

and records called for by the subpoena could in no way tend to incriminate him.

nation is personal to a witness and cannot be claimed in behalf of another, inclusive of an employing corporation, *unless guilt of the witness producing the record is also involved"*. (Emphasis added.) This Court held that the privilege did not apply to the subpoenaed documents.

Defendants rely on the language from *Moser* and *St John,* emphasized above, to support their contention that the books and records are privileged if they will be personally incriminating to Miskinis. We agree that these opinions lend themselves to such an interpretation. Nevertheless, we find, as did the Court of Appeals, that the emphasized portions of these opinions are dicta to the extent that they state that a custodian of corporate and partnership records can refuse to produce them on the grounds that they are personally incriminating to him because neither Court was faced squarely with, nor fully addressed, the issue.

Now being faced squarely with the issue in this context, we decline to construe art 1, § 17 more liberally than the Fifth Amendment. This constitutional provision "should be construed to effect a practical and beneficial purpose". *In re Watson,* 293 Mich 263, 275; 291 NW 652 (1940). So sweeping an interpretation is not dictated by, nor consonant with, public policy. Such a ruling would drastically impede the investigation of white collar crime, *e.g.,* tax evasion, embezzlement, bribery, and corruption. Moreover, discovery in civil cases would be severely restricted whenever the conduct underlying the civil liability might also give rise to criminal liability, *e.g.,* antitrust violations and securities fraud. See *St John v General Motors Corp, supra.* This would be contrary to Michigan's "strong historical commitment to a far-reaching, open and effective discovery practice". *Daniels v*

*Allen Industries, Inc,* 391 Mich 398, 403; 216
NW2d 762 (1974). Permitting custodians of an
organization's records to assert their privilege to
bar production of the documents would encourage
persons contemplating criminal conduct to carry it
out under the name of a corporation or partner-
ship, thus guaranteeing immunity from personal
civil liability while enjoying the personal privilege
against self-incrimination. Indeed, as we noted
earlier, the individual defendant, Joseph Miskinis
himself, raised the separate legal status of the
theater, answering the original complaint by deny-
ing personal liability on the grounds that the Oak
Drive-In Theatre and the Civic Theatre were
owned by a corporation and by a partnership,
respectively, and that he had a minority interest
in each entity. Defendant, having shielded himself
from civil liability behind the veil of the corporate
and partnership entities, cannot now lift the veil
to gain the benefit of using his personal privilege
to conceal business records.

Defendants also argue, however, that an amend-
ment to the provision made in the constitution
precludes the production of the documents here.
Prior to adoption of the Constitution of 1963, the
analogous provision of the Constitution of 1908
was as follows:

"No person shall be compelled in any criminal case to
be a witness against himself, nor be deprived of life,
liberty or property, without due process of law." Const
1908, art 2, § 16.

The Constitution of 1963 kept the above-quoted
language intact and added the following language:

"The right of all individuals, firms, corporations and
voluntary associations to fair and just treatment in the

course of legislative and executive investigations and hearings shall not be infringed."

Defendants rely on the inclusion of the word "individuals" and argue that by including individuals, without distinction, with firms, corporations, and voluntary associations, it is clear that an individual who is an officer of a corporation or a partner in a firm who is in control of, and in charge of, and who is responsible for the composition, contents, possession and authorship of documents and records, is fully entitled to the benefits of the privilege against self-incrimination. We disagree.

The record of the Constitutional Convention makes clear that this added language was intended as a new guarantee of fair and just treatment in *legislative* and *executive* investigations.[12] This amendment was not intended to modify the scope of the privilege against self-incrimination.

Finally, since the minority opinion avoids the issue of the scope of the Michigan constitutional provision against self-incrimination by finding that there was a contractual waiver of the privilege against self-incrimination, a comment on this analysis is appropriate. The contractual waiver provision was never raised by any party and was neither briefed nor argued before this Court. We would not hold that this Court should never ad-

---

[12] "This is a revision of Sec. 16, Article II of the present constitution. The second sentence incorporates a new guarantee of fair and just treatment in legislative and executive investigations. This recognizes the extent to which such investigations have tended to assume a quasi-judicial character.

"The language proposed in the second sentence does not impose categorically the guarantees of procedural due process upon such investigations. Instead, it leaves to the Legislature, the Executive and finally to the courts, the task of developing fair rules of procedure appropriate to such investigations. It does, however, guarantee fair and just treatment in such matters." 2 Official Record, Constitutional Convention 1961, p 3364.

dress an issue not raised by the parties. Indeed, this Court has done so, rarely, in limited circumstances where justice so required. See, *e.g., City of Dearborn v Bacila,* 353 Mich 99, 118; 90 NW2d 863 (1958). Nevertheless, where it appears that there may be a cognizable response to an issue, the preferable course of action would be a remand to permit the trial court to resolve the issue. The minority has cited no case for the proposition that this Court can resolve a case on the basis of an issue not raised by the parties in order to avoid resolution of a constitutional issue.

## IV. CONCLUSION

Accordingly, we hold that the compelled production of the books and records of the Oak Drive-In Theatre Company and the Civic Theatre Company is not violative of Const 1963, art 1, § 17. The trial court's order, as modified by the Court of Appeals, adequately protects the individual defendant's right against self-incrimination with respect to non-corporate and non-partnership records. The judgment of the Court of Appeals is affirmed.

WILLIAMS, C.J., and RYAN and BRICKLEY, JJ., concurred with BOYLE, J.

LEVIN, J. *(concurring).* The question presented is whether the federal[1] and state[2] constitutional privileges that protect against compelled self-incrimination preclude a court from requiring Joseph Miskinis, one of the defendants in this civil action, to disclose to the plaintiffs corporate and partnership documents in his possession.

We agree with the majority that the United

---

[1] US Const, Am V.

[2] Const 1963, art 1, § 17.

States Supreme Court has ruled that the Fifth Amendment does not bar the compelled disclosure of corporate and partnership documents held in a representative capacity; consequently, we agree that the Fifth Amendment does not protect Miskinis from being compelled to produce the documents. We also concur with the majority's decision that Miskinis is not protected by the state privilege from compelled disclosure of the documents. We would hold against his claim of the state privilege, however, because the privilege was waived in the contracts entered into between the plaintiffs and the corporate and partnership defendants. In light of that waiver, we need not reach the question whether this Court should adopt as an exception to the state constitutional privilege the exception to the Fifth Amendment privilege that has been so enunciated by the United States Supreme Court.

I

Miskinis, his mother Mary Miskinis, and his now deceased father Joseph Miskinis, Sr., were partners in a partnership and owned 75% of the capital stock of a corporation that exhibited motion pictures. Miskinis, acting for the partnership and corporation, entered into license agreements with most of the nationwide distributors of motion pictures. Under these agreements, the distributors retained ownership of the motion pictures and permitted exhibitors to show the films. In return, the exhibitor agreed to pay the distributor a percentage of his theater's gross receipts. To protect against an exhibitor's understating gross receipts, the license agreements included a requirement that the exhibitor prepare and submit statements of the daily gross receipts. The license agreements

also required the exhibitor to retain his records for at least four years. The distributors reserved the right in the agreements to inspect the exhibitor's records at any time.

Believing that the Miskinis partnership and corporation were understating their gross receipts, and hence paying the distributors less than contractually required, the distributors asked to examine the corporate and partnership records. Their request was denied. The distributors commenced this action alleging breach of contract, in failing to allow inspection of the documents and in submitting false statements of gross receipts, and, originally, intentional misrepresentation.

Miskinis, one of several defendants, possesses most of the records sought in this action. He again refused, after the action was commenced, to produce them for inspection by the distributors, claiming his federal and state constitutional privileges against compelled self-incrimination. The circuit court found that neither the federal nor the state privilege applies to corporate or partnership records and ordered Miskinis to produce the records. The distributors were ordered not to disclose any information which they might find in those records to anyone except their legal counsel or the court. The Court of Appeals affirmed.[3]

---

[3] In affirming the circuit court, the Court of Appeals noted that the order of the circuit court, "requiring production of 'federal, state, and local tax returns on which the proceeds from ticket and concession sales were reported', could include defendant Miskinis's personal tax returns, as opposed to just those of the corporation and partnership". The Court of Appeals directed that, "[s]hould the order turn out to cover personal tax returns and should defendant Miskinis be convinced that such returns contain incriminating information, Miskinis may present the returns to the trial court to determine whether that is the case. The trial court, upon determining that such returns are incriminating personal records, shall delete any incriminating portions and permit plaintiffs to examine and copy the remaining parts to the extent they are pertinent to this lawsuit". *Id.* Unpublished opinion per curiam, decided August 26, 1981 (Docket No. 53143).

We would affirm, although for different reasons.

## II

The Fifth Amendment privilege against compelled self-incrimination, applied to the states through the Fourteenth Amendment,[4] may be claimed in civil proceedings[5] if the person claiming the privilege is subject to criminal prosecution and disclosure may incriminate him.[6] Miskinis may be

[4] See *Malloy v Hogan,* 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

[5] A witness may invoke the Fifth Amendment "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory". *Kastigar v United States,* 406 US 441, 444; 92 S Ct 1653; 32 L Ed 2d 212 (1972). See also Comment, *Plaintiff as Deponent: Invoking the Fifth Amendment,* 48 U Chi L Rev 158, 160 (1981).

The Fifth Amendment privilege applies in discovery proceedings in a civil action. See *Black Panther Party v Smith,* 213 US App DC 67, 94-98; 661 F2d 1243 (1981), *vacated* 458 US 1118 (1982); *SEC v First Financial Group of Texas, Inc,* 659 F2d 660, 668 (CA 5, 1981); *Baker v Limber,* 647 F2d 912, 916-918 (CA 9, 1981); *United States v US Currency,* 626 F2d 11, 14-18 (CA 6, 1980), *cert den* 449 US 993 (1980); *Wehling v Columbia Broadcasting System,* 608 F2d 1084, 1086-1089 (CA 5, 1979); *Thomas v United States,* 531 F2d 746, 749-750 (CA 5, 1976).

The Federal Rules of Civil Procedure do not provide for the compelled discovery of privileged information. Rule 26 of the Federal Rules of Civil Procedure provides for the discovery of all relevant information "unless the information is privileged". FR Civ P 26(b)(1). Rule 37, which provides for court-imposed sanctions if a party refuses to permit discovery, applies only to valid Rule 26 discovery orders.

The state constitutional privilege against compelled self-incrimination likewise applies in civil discovery proceedings. See, *e.g., State ex rel Washtenaw County Prosecuting Attorney v Western Union Telegraph Co,* 336 Mich 84; 57 NW2d 537 (1953). Following the lead of the Federal Rules of Civil Procedure, the General Court Rules limit the scope of discovery to non-privileged matters. See GCR 1963, 302.2(1), 310.1(1), (2).

[6] A court will uphold a witness's claim only when the witness faces criminal sanctions giving rise to "substantial and 'real', and not merely trifling or imaginary, hazards of incrimination". *United States v Apfelbaum,* 445 US 115, 128; 100 S Ct 948; 63 L Ed 2d 250 (1980). A witness therefore may not invoke the Fifth Amendment where subsequent prosecution for acts about which he is being questioned is no longer possible because of the Double Jeopardy Clause or the running of the statute of limitations on prosecutions. *Reina v United States,* 364 US 507, 513; 81 S Ct 260; 5 L Ed 2d 249 (1960); *Little Rock School*

subject to criminal prosecution for the activities disclosed in the documents now sought,[7] and therefore may assert the privilege in a civil action.[8]

The Fifth Amendment privilege applies to the compelled production of documents to the extent that a person might incriminate himself by producing them.[9] In this case, Miskinis would be

---

*Dist v Borden, Inc,* 632 F2d 700, 704 (CA 8, 1980); *In re Folding Carton Antitrust Litigation (Appeal of Brown),* 609 F2d 867, 872 (CA 7, 1979) (per curiam); *Ellis v United States,* 135 US App DC 35, 46, fn 29; 416 F2d 791 (1969); *United States v Miranti,* 253 F2d 135, 138 (CA 2, 1958); Strachan, *Self-Incrimination, Immunity, and Watergate,* 56 Tex L Rev 791, 796 (1978). Similarly, the Fifth Amendment is not applicable when an executive pardon or grant of immunity precludes future criminal prosecution of the witness on the basis of the compelled testimony. *Kastigar v United States,* fn 5 *supra,* 406 US 441 *passim; Brown v Walker,* 161 US 591, 598-599; 16 S Ct 644; 40 L Ed 819 (1896).

[7] Miskinis argued below that he could be prosecuted for embezzlement under MCL 750.174; MSA 28.371. The circuit court compelled the disclosure of the documents in part because it concluded that "there was no likelihood of criminal proceedings". A person's Fifth Amendment privilege is not lost, however, merely because subsequent prosecution is not likely. The inquiry, rather, is two-pronged: (1) whether the witness's disclosures might indicate his participation in criminal activity, and (2) whether any answers given subject the witness to a *possibility* of criminal prosecution. See Comment, *Prospective Determinations of Derived Use in Civil Proceedings: Upsetting the Immunity Balance,* 50 Fordham L Rev 989, 994, fn 23 (1982). Before a court may reject a Fifth Amendment claim and compel testimony, the court must determine that there is not a real *possibility* of prosecution. See *Hoffman v United States,* 341 US 479, 486-487; 71 S Ct 814; 95 L Ed 1118 (1951); *Rogers v United States,* 340 US 367, 374-375; 71 S Ct 438; 95 L Ed 344 (1951); Comment, *Prospective Determinations of Derived Use, supra,* p 994, fn 23.

[8] Absent a finding that the compelled disclosures would not serve as a link in the acquisition of incriminating information, or that there was not a real possibility of criminal prosecution, we assume for the purposes of decision in the instant case that the disclosures sought by the plaintiffs are incriminating and may possibly expose Miskinis to criminal prosecution.

[9] The applicability of the Fifth Amendment privilege to documents has been the subject of much comment. See *Andresen v Maryland,* 427 US 463; 96 S Ct 2737; 49 L Ed 2d 627 (1976); *Fisher v United States,* 425 US 391, 407-412; 96 S Ct 1569; 48 L Ed 2d 39 (1976); *In the Matter of Grand Jury Empanelled March 19, 1980,* 680 F2d 327, 329-336 (CA 3, 1982), *aff'd in part and rev'd in part sub nom United States v Doe,* — US —; 104 S Ct 1237; 79 L Ed 2d 552 (1984); *United States v Fox,* 721 F2d 32 (CA 2, 1983); McKenna, *The*

authenticating documents he produces as being the ones that he kept and the ones that the plaintiffs seek. Neither the circuit court nor the Court of Appeals found that Miskinis' production of these documents would not be incriminating; neither court found that a subsequent criminal prosecution of Miskinis is not possible, or is no more than an imaginary prospect. Accordingly, unless an exception to the Fifth Amendment privilege precludes Miskinis from invoking it, he may not be compelled to produce the documents.

The Fifth Amendment privilege, however, no longer protects corporate or partnership documents from disclosure.[10] The "corporate documents" exception was first stated in *Wilson v United States,* 221 US 361, 381-385; 31 S Ct 538; 55 L Ed 771 (1911), where the United States Supreme Court held that a person could be compelled to produce corporate documents that incriminated him. The Court said that, by allowing a business to incorporate, the state reserved the right to inspect the corporation's documents to assure that the corporation was not abusing the privileges granted by the state. The right of visitation, said the court, was an implied aspect of the compact between the corporation and the state, and could be availed of by the federal government. See *id.,* p 382.

---

*Constitutional Protection of Private Papers: The Role of a Hierarchical Fourth Amendment,* 53 Ind L J 55 (1977-1978); Note, *The Rights of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of Fisher v United States,* 95 Harv L Rev 683 (1982). As set forth in *Fisher,* and reiterated in *Doe,* a person may refuse to produce documents under the Fifth Amendment when production would have testimonial aspects, such as the authentication of the documents, that would be incriminating.

[10] See *Bellis v United States,* 417 US 85; 94 S Ct 2179; 40 L Ed 2d 678 (1974); *United States v White,* 322 US 694; 64 S Ct 1248; 88 L Ed 1542 (1944); *Wilson v United States,* 221 US 361; 31 S Ct 538; 55 L Ed 771 (1911).

The corporate documents exception was then enlarged to require a member of an unincorporated union to produce incriminating union documents. See *United States v White,* 322 US 694; 64 S Ct 1248; 88 L Ed 1542 (1944). The Court concluded that the state's need to regulate the economic activities of large organizations justified an expansion of the corporate documents exception. See *White, supra,* pp 700-701.[11]

[11] The view that the privilege against self-incrimination should not be held hostage to perceived necessity was expressed in *Entick v Carrington,* 19 Howell's State Trials 1029; 95 Eng Rep 807 (KB, 1765), *quoted with approval* in *Boyd v United States,* 116 US 616, 629; 6 S Ct 524; 29 L Ed 746 (1886):

"Lastly, it is urged as an argument of utility, that such a search is a means of detecting offenders by discovering evidence. * * * There is no process against papers in civil causes. It has often been tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence, there is no way to get it back but by action. In the criminal law such a proceeding was never heard of; and yet there are some crimes, such, for instances as murder, rape, robbery, and house-breaking, to say nothing of forgery and perjury, that are more atrocious than libeling. But our law has provided no paper-search in these cases to help forward the conviction. Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain that the law obligeth no man to accuse himself * * *."

This Court has voiced a similar view:

"That 'the end justifies the means' is a doctrine which has not found lodgment in the archives of this court. The search and seizure * * * was an unauthorized trespass and an invasion of the constitutional rights of this defendant. These rights of the individual in his person and property should be held sacred, and any attempt to fritter them away under the guise of enforcing drastic sumptuary legislation (no matter how beneficial to the people it may be claimed to be) must meet with the clear and earnest disapproval of the courts." *People v Marxhausen,* 204 Mich 559, 567; 171 NW 557 (1919).

The government's asserted need, as expressed in *White,* is to regulate the economic activities of organizations, not to imprison members of the organization engaged in wrongdoing. See *White, supra,* p 700; *Communist Party of the United States v United States,* 127 US App DC 389, 395, fn 9; 384 F2d 957 (1967) (discussing *White's* reference to the regulation of "economic" activity of organizations). That need can be satisfied through a prosecutorial grant of immunity to the person in possession of the documents. Federal prosecutors are empowered to grant immunity under 18 USC 6001-6003. Immunity

The Court in *White* looked to whether the character of the organization was personal or impersonal to distinguish those organizations whose business documents were protected by the Fifth Amendment from those organizations whose documents were not so protected. If the organization had "a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only", the Fifth Amendment privilege would not apply to its documents. See *id.*, p 701. The Court noted that the union had a perpetual life and that there was a potential for conflict between the organization and its members; it did not discuss the degree to which the union represented its members to third persons, or whether persons doing business with the union thought in terms of doing business with an independent organizational entity. The language of the test enunciated, and the facts relevant to its application, suggested that the Court was concerned with the relationship between the organization and its members rather than the relationship between the organization and those with whom it did business.[12]

may be granted in Michigan pursuant to MCL 780.701; MSA 28.1287(101), MCL 767.6; MSA 28.946. Once granted immunity, the person is required to produce the documents because they no longer can be "self-incriminating". See *Kastigar v United States*, 406 US 441; 92 S Ct 1653; 32 L Ed 2d 212 (1972) (discussing federal use and derivative use immunity); *In re Colacasides*, 379 Mich 69; 150 NW2d 1 (1967) (discussing state transactional immunity).

[12] See *United States v Cohen*, 388 F2d 464 (CA 9, 1967) (referring to the organization whose records were being sought as an "impersonal" one); *Communist Party of the United States v United States*, fn 11 *supra*, p 396 ("A standard of differentiating between organizations in terms of their 'impersonal', as distinct from their 'personal', character is admittedly elusive in meaning and difficult of application. It is clear, however, that the [United States] Supreme Court [in *White*] was not prepared to say that the privilege was without significance in

In *Bellis v United States*, 417 US 85, 95-100; 94
S Ct 2179; 40 L Ed 2d 678 (1974), the Court held
that a former partner in a dissolved three-member
law firm could be compelled to produce self-incrim-
inating partnership documents,[13] and appeared to

respect of any and all organizations under any and all circum-
stances."); *United States v Cogan,* 257 F Supp 170, 172-174 (SD NY,
1966) (focusing on the extent and character of the partnership owner-
ship group, the court held that the Fifth Amendment applied to
documents of "small and personal" partnerships); 13 Fordham L Rev
238, 239 (1944) ("The instant case *[United States v White,* fn 10 *supra],*
while novel to the extent that it dealt with the claim of privilege on
behalf of a semi-corporate organization, is not a departure from
settled principles of constitutional law. This decision is not an innova-
tion * * *. Rather *the decision turns upon the application of those
principles after a consideration of the relationship which exists be-
tween an unincorporated labor union and its members.")* (emphasis
added). See also *Bellis,* fn 10 *supra,* pp 102-105 (Douglas, J., *dissent-
ing)* (reviewing the characteristics of the union that had led the Court
to conclude it was an "impersonal organization"); *United States v
Silverstein,* 314 F2d 789, 791 (CA 2, 1963) ("The inquiry is * * *
essentially a factual one into the nature of the particular entity".
Having examined the relationship between the general partners, the
limited partnerships, and the partnership itself, the court concluded
that the partnership entity was not a small family business and that
its documents therefore were not protected by the privilege.).

[13] Historically, partnership documents were often protected by the
Fifth Amendment privilege against compelled self-incrimination. See
*United States v Slutsky,* 352 F Supp 1105, 1107 (SD NY, 1972);
*United States v Cogan,* 257 F Supp 170, 172 (SD NY, 1966); *In re
Subpoena Duces Tecum,* 81 F Supp 418, 420-421 (ND Cal, 1948);
*United States v Brasley,* 268 F 59 (WD Pa, 1920); 13 Fordham L Rev 238,
242, fn 33 (1944) ("[T]he draftsman of the Uniform [Partnership] Act[ ]
is of the opinion that the Act treats a partnership as a mere aggre-
gate [of its members] and his conclusions seem to be warranted * * *.
The courts have sustained the privilege against self-incrimination in
favor of a partnership. *Internal Revenue Agent v Sullivan,* 287 F 138
[WD NY, 1923]".) See generally cases cited in *United States v Silver-
stein,* 314 F2d 789, 790 (CA 2, 1963). But see generally Anno: *Right of
Partners to Assert Personal Privilege Against Self-Incrimination
With Respect to Production of Partnership Books or Records,* 17
ALR4th 1039. As Justice Douglas noted in his dissent in *Bellis, supra,*
p 105, the subpoena in *Boyd v United States,* 116 US 616; 6 S Ct 524;
29 L Ed 746 (1886), which the Supreme Court refused to enforce over
a Fifth Amendment claim, "was directed at a partnership and not an
individual. As the Government here concedes * * *, both parties and
the Court assumed in *Boyd* that the partnership documents there
sought were personal property." But see *Bellis, supra,* p 95, fn 2
(refusing to be bound by *Boyd).* It is unclear why a member of a small
law partnership should be treated differently than a sole proprietor or

abandon the test enunciated in *White*.[14] The new test announced in *Bellis* focused on whether the partnership had "an established institutional identity independent of its individual partners". Rather than inquiring into the relationship between the members of the partnership and the partnership entity, as suggested in *White,* the Court inquired into, among other things, the formality of the partnership's organization and its finances, properties, tax liability, and stationery. The Court declared that the partnership had "held itself out to third parties as an entity with an independent institutional identity". Also important was that the petitioner, like the union member in *White,* did not own the records directly, but vicariously through his membership in the entity.

The "corporate documents" exception to the Fifth Amendment appears to have grown as the Court has seen a governmental need to regulate the business activities that might be disclosed in documents. This growth has extended an exception to the privilege first recognized in relation to corporations, in light of their incorporation compact with the state, to the documents of large impersonal organizations and then to the documents of small, personal partnerships. Recently, the Court re-examined[15] the rule that the Fifth

---

a single practitioner. See *Bellis, supra,* pp 87-88; *1980 Grand Jury,* fn 9 *supra,* p 330; *In re Grand Jury Subpoena,* 646 F2d 963, 968 (CA 5, 1981); *In re Matter of Grand Jury Empanelled February 14, 1978,* 597 F2d 851, 859 (CA 3, 1979). As Justice Douglas observed, "[i]f [the petitioner in *Bellis]* had been conducting a solo practice, his claim of privilege could not be overridden, as the Government here necessarily conceded. I am unable to perceive why he should be held to have forfeited that constitutional right by joining with two others in a partnership." *Bellis, supra,* p 104 (Douglas, J., *dissenting).* But see generally *In re Grand Jury Proceedings United States,* 626 F2d 1051, 1054-1059 (CA 1, 1980) (suggesting that, because sole proprietors are indistinguishable from partnerships, the business records of neither should be protected by the privilege).

[14] See *Bellis, supra,* p 100.

[15] See *Doe,* fn 9 *supra.*

Amendment privilege protects the business documents of a sole proprietor.[16] That the Court confronted what once was regarded as a settled issue demonstrates just how fluid the exception has become.

In light of the exception developed by the United States Supreme Court, we concur with the majority's conclusion that the Fifth Amendment privilege does not apply to the documents now being sought.[17]

---

[16] See *Bellis, supra,* pp 87-88 (recognizing that "[t]he privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life"); *Wilson v United States,* fn 10 *supra; United States v Fox,* 721 F2d 32 (CA 2, 1983) (holding that the Fifth Amendment privilege applies to sole proprietor's tax records); *United States v Porter,* 711 F2d 1397, 1400-1402 (CA 7, 1983) (holding that the Fifth Amendment applies to the production of "business records generated by a sole proprietor taxpayer"); *1980 Grand Jury,* fn 9 *supra* (holding that the Fifth Amendment privilege applies to business records of sole proprietors); *United States v Davis,* 636 F2d 1028, 1042-1044 (CA 5, 1981). But see *Andresen, supra; Fisher, supra; 1980 Grand Jury,* fn 9 *supra,* p 864 (reserving question whether individual can apply privilege to his tax records). See generally *United States v Willis,* 565 F Supp 1186, 1195-1218 (SD Iowa, 1983).

[17] We are not persuaded—applying the rationale developed by the United States Supreme Court—that a family partnership is analytically distinguishable from a small, personal, three-member law partnership. Accordingly, we are of the opinion that the Fifth Amendment privilege does not protect documents of family partnerships. Under the *White* test family partnerships might have been considered sufficiently personal in nature so that the Fifth Amendment protected documents of such partnerships. Under *Bellis,* p 95, however, the Fifth Amendment is inapplicable to a partnership which has "an established institutional identity independent of its individual partners". Because family partnerships may have such an independent identity to the same extent as non-family partnerships, they presumably should be treated no differently. Other courts have refused to distinguish small family partnerships from the small, three-member law firm in *Bellis,* and have held that partnership documents were not protected by the Fifth Amendment privilege. See *United States v Alderson,* 646 F2d 421, 422-423 (CA 9, 1981); *United States v Hankins,* 565 F2d 1344 (CA 5, 1978); *United States v Mahady & Mahady,* 512 F2d 521, 524 (CA 3, 1975); *In re Sentinel Financial Instruments,* 553 F Supp 71, 72-76 (SD NY, 1982); *In the Matter of September, 1975 Special Grand Jury,* 435 F Supp 538, 542-546 (ND Ind, 1977); *South Carolina Tax Comm v Reeves,* 278 SC 658; 300 SE2d 916, 916-917

(1983); *People v Lynch,* 83 Ill App 3d 479, 481-485; 404 NE2d 814 (1980).

To be sure, the majority in *Bellis,* p 101, wrote that "[t]his might be a different case if it involved a small family partnership, see *United States v Slutsky,* 352 F Supp 1105 (SD NY, 1972); *In re Subpoena Duces Tecum,* 81 F Supp 418, 421 (ND Cal, 1948)". Nevertheless, the Court failed to suggest an analytic reason why a different result might be justified.

In *In re Subpoena Duces Tecum,* pp 420-421, one of the two cases cited in *Bellis,* a United States district court held that documents that belonged to a small family partnership were protected by the Fifth Amendment. The court first noted that, under state law, ownership and possession of partnership documents were both shared and personal. The court held that the test in *White, supra,* which had extended the "corporate documents" exception to impersonal unincorporated organizations, did not apply to small family partnerships:

"It is only when a group or association of persons is 'so impersonal in the scope of its membership and activities that it cannot * * * represent the purely private or personal interests of its constituents', that the right is unavailable.

"I am of the opinion that the doctrine of *United States v̇ White* * * * cannot be extended to the members of a partnership * * * whose only purpose is to conduct the personal business of the partners and to divide and share their profits and losses for their mutual benefit and protection.

"It may be that some partnerships, which have a large number of partners * * * might * * * take on the habiliments of an association or corporation.

"But certainly this small family partnership does not reach such a stature. The nature of this partnership is not of the kind that the partners' ownership of their own papers in common, is any less personal [than their own individually owned documents]."

In *United States v Slutsky,* pp 1106-1109, the other case cited in *Bellis,* two brothers, who had formed a partnership to run a business started by their father, refused to produce the partnership's business records. The partnership, consisting solely of the two brothers, operated a resort hotel country club. The club had a payroll of approximately $1,000,000, gross receipts of $4,000,000, and buildings worth approximately $4,400,000. It employed several full- and part-time cashiers, a full-time bookkeeper, and a full-time accountant. The two partners and their two sons lived on and personally managed the resort premises. Applying the test enunciated in *White,* the United States district court held that the partners could not be compelled to produce partnership documents. The court recognized that the size of a partnership was not determinative under that test. "The Supreme Court in *White* emphasized the nature of the group associated, as well as its size." Examining the nature of the association of the brothers' partnership, the court wrote:

"This small family partnership is not so impersonal in the scope of its membership and activities that it cannot represent the purely private or personal interests of its constituents. Some partnerships

## III

By extending the exception to the Fifth Amendment privilege developed by the United States Supreme Court to the state constitutional privilege, the majority declines to follow previous inter-

consisting of a large number of partners, some special or limited as well as general, might be so impersonal in the scope of the membership and activities that the firm does not embody the personal or private interest of the constituent partners. Surely this two-brother family partnership does not reach such status * * *. [The resort] appears to be a personal family business, albeit large and successful. The records sought here, therefore, are not merely 'impassive and impersonal records of business events transacted between the firm and those with whom it dealt'."

The majority states that in *Slutsky* "the partnership's records and papers [were] inseparable from the personal and private papers of its members". *Ante*, p 725. The *Slutsky* opinion emphasized, however, the close relationship between the two brothers and their partnership rather than the connection between the papers of the brothers and the papers of the partnership. The Court in *Slutsky*, p 1106, stated that it was hearing a motion "to compel the production of *business records* * * * of a two-man partnership*". (Emphasis added.) The conclusion in *Slutsky* was that "[t]he partners were intimately involved with the operation of the business, so much so that the district court was convinced that the partnership records were the *purely* private and personal records of the partner-brothers". *United States v Greenleaf*, 546 F2d 123, 128 (CA 5, 1977) (refusing to except family partnerships from the *Bellis* rule because none of the partners involved were related). Accord, *Wilson v California Health Facilities Comm*, 110 Cal App 3d 317, 322, fn 4; 167 Cal Rptr 801 (1980), *app dis* 450 US 1036 (1981). See also *United States v Onassis*, 125 F Supp 190, 210 (D DC, 1954).

The asserted distinction between small family partnerships and impersonal partnerships is not, as the majority states, merely a restatement of the doctrine that "the papers required to be produced must not be the private and personal papers of the individuals held in a personal capacity". *Ante*, p 725. Rather, it is urgent that, in light of the close, personal relationship between family members, the records of a partnership formed by a few close relatives constitute, in fact, the partners' private documents.

In sum, family partnerships generally are personal, rather than impersonal, business organizations. Under *White*, therefore, the Fifth Amendment generally would have protected the documents of such a partnership. The new test, promulgated in *Bellis*, is whether the partnership has an established institutional identity separate from its individual members. We agree with the majority's conclusion that the Miskinis partnership had a separate institutional identity; consequently, we agree with the majority's holding that the Fifth Amendment does not apply to the partnership documents now sought.

pretations of the scope and protections accorded by the state privilege.

This Court has stated, and thereafter reaffirmed, that the state constitutional privilege against compelled self-incrimination should be construed liberally. See *In re Schnitzer,* 295 Mich 736, 740; 295 NW 478 (1940); *People ex rel Moll v Danziger,* 238 Mich 39, 42; 213 NW 448 (1927); *Joslin v Noret,* 224 Mich 240, 244; 194 NW 983 (1923). As with the Fifth Amendment privilege, the state "constitutional provisions regarding the privilege against self-incrimination also apply to [disclosure] in a civil proceeding which might subject the witness to criminal prosecution." A person thus may "assert the privilege in a civil proceeding * * * even though its assertion would work a hardship upon the civil plaintiff who has no interest whatever in a criminal action if brought." *Berney v Volk,* 341 Mich 647, 651-653; 67 NW2d 801 (1955).

This Court has said that the state privilege applies to corporate and partnership documents. The scope, as well as the limits, of the state privilege were discussed in *In re Moser,* 138 Mich 302, 313-315; 101 NW 588 (1904):

"No private individual can be compelled to produce his books or papers for the purpose of affording evidence against himself in a criminal prosecution. Neither can the subterfuge of subpoenaing his clerk, who has access to or temporary possession of the books for the purpose of his employer's business, be resorted to, to compel a production of the books. The possession of the clerk in such case is the possession of his employer. * * * One cannot be compelled to produce his own books, or the books of another, which are under his control as agent or otherwise, where their production would tend to criminate him; neither can his clerk, whose possession is his possession, be required to produce them".

The Court, discussing the "unreported case of *Frazer v Circuit Judge*", said that a person's privilege against compelled disclosure of self-incriminating documents applied to corporate records:

"In that case the officers of the Detroit City Railway Company, in whose possession and control the books were, and who were under investigation by the grand jury, were ordered by a subpoena duces tecum to produce the books. It requires no argument to show that they were thus required to produce testimony against themselves and were therefore within the protection of the Constitution."

*In re Moser* was decided shortly after the United States Supreme Court had held that the Fifth Amendment privilege protected a member of a small partnership from being compelled to produce incriminating partnership records that the partnership was required by federal law to keep. See *Boyd v United States,* 116 US 616; 6 S Ct 524; 29 L Ed 746 (1886). In light of the holding in *Boyd,* which was cited approvingly in *In re Moser,*[18] this Court could thus declare with complete accuracy that "[t]he provision in each Constitution is the same".[19] This Court has reiterated the view that a person may not be compelled to produce incriminating business documents, see *People v Marxhausen,* 204 Mich 559, 568-574; 171 NW 557 (1919) (quoting *Boyd* with approval), or incriminating corporate documents, see *St John v General Motors Corp,* 308 Mich 333, 337; 13 NW2d 840 (1944).

Today the majority limits the application of the state constitutional privilege to those situations where the federal privilege, with its significant

---

[18] See *In re Moser, supra,* pp 313-314.
[19] *Id.,* p 305.

limitations by the United States Supreme Court,[20] continues to apply.[21] By so limiting the Michigan constitutional privilege, the majority holds that a state protection once considered to be undoubted no longer exists.

Although this Court may adopt in the construction of the state constitution those Fifth Amendment doctrines developed by the United States Supreme Court that we are persuaded are correct, we are not bound to incorporate all such doctrines as the measure of the state constitutional privi-

[20] See *ante,* pp 732-742; *Andresen v Maryland,* 427 US 463; 96 S Ct 2737; 49 L Ed 2d 627 (1976); *Fisher v United States,* 425 US 391, 407-412; 96 S Ct 1569; 48 L Ed 2d 39 (1976); *United States v Schlansky,* 709 F2d 1079, 1082-1084 (CA 6, 1983); *1980 Grand Jury,* fn 9 *supra,* pp 329-336; Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv L Rev 489, 497 (1977); Note, *The Aftermath of Fisher,* fn 9 *supra,* pp 684-686.

[21] Although the majority suggests that the state privilege should not be interpreted differently than the Fifth Amendment privilege, see *ante,* p 726, we do not read that suggestion literally. If it were, today's decision would do more than appear to overrule *sub silentio* the views expressed in *In re Moser.* If today's decision really anchors the state privilege to the Fifth Amendment, the majority overrules a line of decisions holding that the state privilege protects a witness from being compelled to give self-incriminating testimony unless he receives a grant of transactional immunity that precludes his subsequent prosecution for activities about which he testifies under the immunity grant. See, *e.g., In re Watson,* 293 Mich 263; 291 NW 652 (1940) (only full transactional immunity supplants state privilege). This contrasts with recent interpretations of the Fifth Amendment, which hold that it protects a person only against being compelled to give self-incriminating testimony that can be used, directly or indirectly, against that person. See *Kastigar v United States,* 406 US 441; 92 S Ct 1653; 32 L Ed 2d 212 (1972).

A witness granted use and derivative use immunity, in contrast with one granted transactional immunity, can be prosecuted for activities about which he was compelled to give self-incriminating testimony under the grant of immunity. Prosecutors are prohibited only from using the testimony, directly or indirectly, in a subsequent criminal prosecution of the witness. See *id.;* Comment, *Prospective Determinations of Derived Use,* fn 7 *supra.* Because a question regarding the kind of immunity necessary to supplant the state privilege is not presented, and *Watson* has not been overruled, the language of the majority opinion concerning the relationship between the Fifth Amendment and the state privilege against compelled self-incrimination should be read in the context of the issue decided today. ·

lege. We are not prepared to join at this time in adopting a doctrine as fluid as the exception developed in the *Wilson, White,* and *Bellis* decisions as the measure of the state privilege. We nevertheless would require Miskinis to produce the corporate and partnership documents on another basis.

## IV

We would hold that Miskinis may be compelled to produce the documents because the Miskinis corporation and partnership contractually agreed to disclose the documents to the plaintiffs. The agreements constitute limited waivers of the state privilege. The conditional disclosure order, being within those limits, should on that basis be affirmed.

Federal and state constitutional protections may be waived.[22] A person may waive some constitutional rights by renouncing them in a contract before the protections accorded by that right may be claimed. For example, a person may, by signing an instrument authorizing the confession of judgment, waive his due process right to notice and hearing before he is deprived of property.[23] A

---

[22] See, *e.g., D H Overmyer Co, Inc, of Ohio v Frick Co,* 405 US 174, 185-186; 92 S Ct 775; 31 L Ed 2d 124 (1972).

In Michigan, confession of judgment is provided for by statute. MCL 600.2906; MSA 27A.2906.

[23] *Id.,* pp 185-187; *Bryant v Jefferson Federal Savings & Loan Ass'n,* 166 US App DC 178; 509 F2d 511 (1974). See also *Sambo's Restaurants, Inc v Ann Arbor,* 663 F2d 686, 690-691 (CA 6, 1981) (discussing contractual waiver of First Amendment, citing *D H Overmyer Co,* fn 22 *supra); Bonner v B-W Utilities, Inc,* 452 F Supp 1295, 1303 (WD La, 1978) ("In commercial situations, persons frequently agree contractually to forego rights secured by the Constitution."); *Allied Artists Pictures Corp v Alford,* 410 F Supp 1348, 1354 (WD Tenn, 1976) (recognizing validity of waiver by local film exhibitors of First Amendment rights in their agreement with local board providing for board screening).

In *Overmyer, supra,* p 186, the United States Supreme Court

observed that "[t]his is not a case of unequal bargaining power or over-reaching. The * * * agreement, from the start, was not a contract of adhesion." The relevance of those circumstances to the Court's decision to sustain the confession of judgment clause as a contractual waiver of due process rights was emphasized by the Court: "Our holding, of course, is not controlling precedent for other facts of other cases. For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue." *Id.*, p 188. See also *Fuentes v Shevin,* 407 US 67, 94-97; 92 S Ct 1983; 32 L Ed 2d 556 (1972).

A United States district court found that the due process right to notice and hearing was not contractually waived where the person who allegedly waived the right by signing a mortgage contract that provided for foreclosure proceedings in the event of default was a consumer rather than a businessperson and the waiver clause "was contained in a paragraph which, like most of the language of the deed of trust, was printed in minute, 8-point type. Defendants have made no showing that [the consumer] was actually aware or made aware of the legal significance of the language." *Turner v Blackburn,* 389 F Supp 1250, 1260-1261 (WD NC, 1975). Accord, *Ricker v United States,* 417 F Supp 133, 139-140 (D Me, 1976). See also *Gonzalez v County of Hidalgo, Texas,* 489 F2d 1043 (CA 5, 1973) (emphasizing that contract including waiver clause was signed by uneducated migrant worker seeking necessary shelter).

Recognizing the reasonableness of such provisions in commercial transactions, courts have sustained the waiver of the right to notice and hearing contained in a mortgage agreement in cases where the mortgagor alleged "that there was no room * * * to negotiate or bargain about the standard clauses" that contained the alleged waiver. *United States v Mountain Village Co,* 424 F Supp 822, 825 (D Mass, 1976). See also *United States v Wynn,* 528 F2d 1048, 1050 (CA 5, 1976) ("The question of the validity of a purported waiver turns on the facts of a particular case. * * * The relative bargaining power of the parties, the borrower's ability to understand the provisions of the contract, and the clarity of the contractual language itself are some of the factors to be considered in deciding whether the lender may constitutionally forego prior notice and hearing."). The Court in *Overmyer,* fn 22 *supra,* p 188, similarly noted that "a cognovit provision may well serve a proper and useful purpose in the commercial world and at the same time not be vulnerable to constitutional attack."

In *Mountain Village, supra,* the court wrote that the mortgagor had extensive experience in real estate and that he therefore "should not be heard to now complain that he did not understand what he was signing." The court sustained the validity of the waiver even though the contract might have been one of adhesion and there was an alleged inequality of bargaining power, concluding: "Nor can it be said that the government has no right to protect its investments by inclusion of such a provision in its contracts. Without federal backing there would probably have been no loan and no mortgage. Consideration was therefore given for this provision's inclusion in the mortgage agreement."

person may waive his privilege against compelled self-incrimination by failing to claim the privilege and voluntarily disclosing incriminating information.[24] A person also may waive a privilege by affirmatively renouncing its protection.[25]

We are of the opinion that a person may contractually bind himself to provide information to someone with whom he is doing business, and thereby waive his constitutional privilege against self-incrimination.[26] Miskinis is contractually bound under the terms of the license agreements, which reserved to the plaintiffs the right to inspect the corporate and partnership documents, to dis-

In contrast to the persons who were claimed to have waived their due process rights in *Turner* and *Ricker,* Miskinis is a businessperson. The license agreements that provided for the disclosure of the documents of the Miskinis corporation and partnership were between businesspersons involved in a commercial transaction, rather than consumers. The most relevant facts of this case more closely resemble those in *Overmyer* and *Mountain Village* than those in *Turner, Ricker,* and *Gonzalez.* See also *Garner v Tri-State Development Co,* 382 F Supp 377, 380-381 (ED Mich, 1974) (distinguishing between alleged waivers of constitutional rights by consumers buying consumer goods and alleged waivers by sophisticated businesspersons involved in commercial property transactions). See generally 16 CJS, Constitutional Law, § 89.

[24] "[I]f a witness under compulsion to testify makes disclosure instead of claiming the privilege, the government [ordinarily] has not 'compelled' him to incriminate himself. 'The Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment' ". *Garner v United States,* 424 US 648, 654-655; 96 S Ct 1178; 47 L Ed 2d 370 (1976), quoting *United States v Monia,* 317 US 424, 427; 63 S Ct 409; 87 L Ed 376 (1943).

[25] See *Garner v United States,* fn 24 *supra,* p 654. See also Anno: *Self-Incrimination—Loss of Privilege,* 47 L Ed 2d 922 (discussing the development of the law regarding waiver of the privilege against compelled self-incrimination).

[26] See generally *D H Overmyer Co v Frick Co,* fn 22 *supra* (upholding confession of judgment contract clause as a constitutional waiver of due process rights, citing as analogous waivers of the right against compelled self-incrimination); *Morris v Metriyakool,* 418 Mich 423; 344 NW2d 736 (1984) (upholding constitutionality of contractual arbitration agreement).

close the documents to plaintiffs, notwithstanding his constitutional privilege against compelled self-incrimination.[27]

The disclosure requirements are reasonable, and therefore enforceable, although contained in what might be contracts of adhesion.[28] The contracts

---

[27] One could argue that the contractual provision requiring the disclosure of the documents to plaintiffs does not constitute a "waiver" of Miskinis' privilege against compelled self-incrimination on the ground that a person's constitutional rights cannot be waived in an agreement between other persons. This argument might be meritorious if this case concerned an employee outside the corporate or partnership management. Miskinis, however, was the representative of the corporation and the partnership who actually dealt with plaintiffs and entered into the license agreements in behalf of the corporation and partnership. As he has argued, the corporation and the partnership were in reality small, personal, family businesses. He cannot claim that he was so uninvolved with the management of those organizations and their ongoing business relationships with plaintiffs that the contractual waivers of the privilege should not apply to him.

One might also argue that the contractual provisions requiring disclosure of the corporate and partnership documents cannot constitute a "waiver" of the state constitutional privilege because the provisions did not evidence an "intentional relinquishment or abandonment of a known right or privilege". *People v Grimmett*, 388 Mich 590, 598; 202 NW2d 278 (1972) (following *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 [1938]). Both *Grimmett* and *Johnson* were concerned with waivers of constitutional rights in the context of a criminal prosecution. This Court has not applied that test where the issue is the validity of a contractual waiver of a constitutional right. See *Morris v Metriyakool,* fn 26 *supra* (upholding constitutionality of contractual arbitration agreement). Cf. *Schneckloth v Bustamonte,* 412 US 218 *passim;* 93 S Ct 2041; 36 L Ed 2d 854 (1973) (discussing the standards to be applied to asserted waivers of different constitutional rights in various circumstances); *D H Overmyer Co, Inc, of Ohio v Frick Co,* fn 22 *supra,* p 185 (stating that "the standard for waiver in a corporate-property-right case of this kind [may not be] the same standard applicable to waiver in a criminal proceeding", but assuming *arguendo* that it was); *Watson v Branch County Bank,* 380 F Supp 945, 974 (WD Mich, 1974), *rev'd without opinion* 516 F2d 902 (CA 6, 1975) ("There is no universal standard that must be applied in every situation where an individual foregoes a constitutional right. * * * The Supreme Court has not yet stated the standards which govern the waiver of due process rights in the context of civil actions for the possession of property. * * * The standard to be applied will depend upon the nature of the right being waived and the circumstances under which the alleged waiver was made.").

[28] See *Raska v Farm Bureau Mutual Ins Co of Michigan,* 412 Mich 355, 370-380; 314 NW2d 440 (1982). See also fn 23 *supra.*

between the plaintiffs and the Miskinis corporation and partnership entitled the plaintiffs to a certain percentage of the receipts. The receipts depended on the number of tickets sold each day. Aware that persons in defendants' position could understate their ticket sales and pay plaintiffs less than required, plaintiffs required defendants to keep accurate records, reserved the right to inspect or "visit" those records, and made spot attendance checks. The reservation of such a visitorial privilege is reasonable under the circumstances,[29] and is similar to the visitorial privilege held in *Wilson* to have been reserved by the state.[30]

## V

This Court is not foreclosed from deciding this case on the basis of a contractual waiver of the state privilege by a failure of the plaintiffs to raise the waiver question explicitly. Although the plaintiffs did not argue that Miskinis' state privilege against compelled self-incrimination was "waived" in the contracts between the plaintiffs and the Miskinis corporation and partnership, they did argue that Miskinis' duty to disclose the docu-

---

[29] It is unclear whether the plaintiffs' legitimate business needs could be protected only through an unlimited waiver of the state privilege rather than one limited to a disclosure of the documents *to the plaintiffs*. We would not be prepared to say, therefore, that plaintiffs could have provided by contract for the disclosure of incriminating documents to a prosecutor. Similarly, we would not be prepared to hold that plaintiffs must be allowed to furnish to a prosecutor the documents that Miskinis is compelled to disclose to the plaintiffs. In this case we need not decide whether a full waiver, rather than one limited to disclosure to the plaintiffs, is "reasonable" and therefore enforceable. The circuit court has prohibited the plaintiffs from disclosing except to their counsel and the court information obtained from the documents. The plaintiffs may thus employ the contractual waiver solely to protect their own economic interests, a purpose and result reasonable in light of the business relationship between the parties.

[30] *Wilson v United States,* fn 10 *supra,* pp 383-384.

ments now sought is based in part on those con-
tracts. The plaintiffs, relying on the contracts,
contended that the Miskinis corporation and part-
nership had a fiduciary duty to render an account-
ing because, as the plaintiffs have urged, they
were acting as trustees for the plaintiffs. The
plaintiffs also maintained that a contractual agree-
ment to disclose documents justifies a court in
compelling disclosure where, but for the contrac-
tual agreement, disclosure could not be compelled.
Plaintiffs further claimed that where a party to a
contract expressly agrees to keep and disclose the
contents of books and records, he is required to
produce such books and records for discovery.

The question whether Miskinis, by entering into
the licensing agreements in behalf of the Miskinis
corporation and partnership, "waived" his privi-
lege against compulsory self-incrimination in re-
spect to the records that he agreed the Miskinis
corporation and partnership would keep and the
plaintiffs would be allowed to inspect, is, in our
opinion, "necessarily suggested" (GCR 1963, 813.1,
854) in plaintiffs' "Counter Statement of the Ques-
tion Involved". The counterstatement included the
statement that appellants had "expressly agreed
in the licensing contracts that appellees had the
right to examine the books and records of appel-
lants' theater operations to determine the amount
of licensing fees rightfully owed to appellees".
Thus, the counterstatement did not state the ques-
tion presented solely in terms of the "corporate
documents exception" developed by the United
States Supreme Court.

## VI

In sum, the Fifth Amendment privilege no lon-

ger protects corporate or partnership documents from compelled disclosure. This Court has said, however, that the state constitutional privilege protects such documents from compelled disclosure. We would hold that whatever state privilege Miskinis had against being compelled to disclose to the plaintiffs documents of his small, personal, family corporation and partnership was waived in the contracts between the plaintiffs and the Miskinis corporation and partnership.[31]

We need not, in light of the basis of disposition we regard to be appropriate, consider whether the fluid corporate documents exception to the Fifth Amendment privilege should be incorporated in the construction of the state constitution as a limitation on the state privilege. For the foregoing reasons, we concur in the result.

\* \* \*

### ADDENDUM

Less than two weeks ago, on February 28, 1984, the United States Supreme Court decided *United States v Doe*, — US —; 104 S Ct 1237; 79 L Ed 2d 552 (1984). In *Doe*, the Court held that a sole proprietor could not be compelled to produce business records that he had written and continued to possess. In doing so, the United States Supreme Court affirmed the United States Court of Appeals for the Third Circuit, which had held that a sole proprietor could not be compelled to produce his business records when that production would have

---

[31] We agree with the majority that a question not raised should not ordinarily be decided by the Court. If the Court believes that a question not raised would be a more appropriate basis of decision, it should ordinarily require additional briefing in this Court, or, as the majority suggests, remand to the trial court (or the Court of Appeals) for further consideration of that question.

testimonial aspects that would incriminate him. *1980 Grand Jury*, fn 9 *supra*, pp 334-336.

A majority of the Supreme Court, however, "reversed" the Third Circuit's alternative holding that the *contents* of a sole proprietor's business documents, like a person's most private diaries, were themselves protected from compelled disclosure by the Fifth Amendment. *Doe, supra*, 79 L Ed 2d 557-558.

The Third Circuit had noted that, until the Supreme Court decided *Fisher v United States*, fn 9 *supra*, the Fifth Amendment had been viewed as protecting from compelled production the *contents* of a person's private papers, as distinguished from his business papers. *1980 Grand Jury*, fn 9 *supra*, pp 331-333. The Court of Appeals recognized that in *Fisher* the Supreme Court "seemingly diverged" from that established view when it said that "the fifth amendment 'applies only when the accused is compelled to make a *testimonial* communication that is incriminating'. * * * In effect, the focus of the Court had shifted from privacy to the process of compulsion". *1980 Grand Jury*, fn 9 *supra*, pp 331-332, quoting *Fisher*, fn 9 *supra*, p 408.

The Third Circuit nevertheless had continued to adhere to the view "that the fifth amendment privilege applies, even after *Fisher*, to an individual's production of his private papers". *Id.*, p 333. Other courts had similarly read *Fisher's* analysis narrowly and held that the Fifth Amendment protects an individual from being compelled to produce private records such as diaries because their contents, rather than the act of producing them, incriminated the individual.[32]

---

[32] See *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981 Witness*, 657 F2d 5 (CA 2, 1981), *decision on remand*, 522 F Supp 977 (SD NY, 1981) (pocket calendars of corporate officer held to be protected from production under Fifth Amendment as officer's private

Concluding that the contents of a sole proprietor's business documents were as protected from compelled production by the Fifth Amendment as his private diaries, the Third Circuit had suggested that their production could not be compelled even if the act of producing them did not have incriminating testimonial aspects. Although affirming the judgment of the Third Circuit, a majority of the United States Supreme Court in *Doe* "reversed" the court's alternative rationale because that rationale had based the protection of the Fifth Amendment on the private nature of the contents of the documents rather than the incriminating nature of the act of producing them. The majority thus reiterated the *Fisher* analysis:

"Where the preparation of business records is voluntary, no compulsion is present. * * * Respondent does not contend that he prepared the documents involuntarily or that the subpoena would force him to restate,

papers); *In re Grand Jury Proceedings,* 632 F2d 1033, 1042-1044 (CA 3, 1980) (the court affirmed the district court's order quashing that portion of a subpoena duces tecum that ordered an individual to produce his private pocket diaries, without determining whether the disclosure would itself have testimonial aspects that would incriminate the individual. The court wrote that the "failure to continue to preserve this right [not to be compelled to produce one's own personal papers] which we believe basic, would be a step backward in what has been a long and bitterly contested battle to accord rights to persons who stand accused of crime". *Id.,* p 1044, and fn 23). See also *United States v Beattie,* 541 F2d 329, 331 (CA 2, 1976) ("We do not read *Fisher* * * * as detracting from the principle that the Fifth Amendment protects against compulsory production of a paper written by an accused with respect to his own affairs * * * and now in his possession."); *United States v Willis,* 565 F Supp 1186, 1196 (SD Iowa, 1983) ("Disallowing Fifth Amendment protection for the contents of business-related records does not require the Court to declare the 'content theory' of Fifth Amendment privilege dead for all purposes. *Fisher's* applicability to nonbusiness, intimate personal papers remains an open question."). But see *United States v Schlansky,* 709 F2d 1079, 1082 (CA 6, 1983) ("The central issue is no longer the nature of the materials whose production is compelled. Instead, the question is whether their production involves testimonial communication on the part of the person to whom a summons or subpoena is directed.").

repeat, or affirm the truth of their contents." *Doe, supra,* 79 L Ed 2d 559-560.

Justice O'Connor concurred, but wrote separately

"just to make explicit what is implicit in the analysis of [the majority] opinion: that the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind. The notion that the Fifth Amendment protects the privacy of papers originated in *Boyd v United States,* 116 US 616, 630 (1886), but our decision in *Fisher v United States,* 425 US 391 (1976), sounded the death-knell for *Boyd.* * * * [I]ts privacy of papers concept 'had long been a rule searching for a rationale * * *.' *Id.,* p 409. Today's decision puts a long-overdue end to that fruitless search." *Doe, supra,* 79 L Ed 2d 563-564.

Faced with an opinion of a United States Court of Appeals that had adopted Justice Brennan's view that the scope of the protections accorded by the Fifth Amendment should be determined in light of the need to protect a person's privacy, see *Fisher,* fn 9 *supra,* pp 414-430 (Brennan, J., *concurring in the judgment),* a majority of the Supreme Court seems to have gone out of its way in *Doe* to hold that the content of a document is irrelevant if the compelled act of production does not itself incriminate the individual.[33] In light of the Court's opinion in *Doe,* as distinguished from its decision, we believe it is fair to say that only a justice of the United States Supreme Court will have the temerity to continue to suggest that the Fifth Amendment protects a person from being compelled to produce his private diaries when

---

[33] See *Doe, supra,* 79 L Ed 2d 564 (Marshall, J., with whom Brennan, J., joined, *concurring in part and dissenting in part); id.,* 79 L Ed 2d 564-567 (Stevens, J., *concurring in part and dissenting in part).*

their contents, but not the act of producing them, incriminate that person.

The opinion of the Court in *Doe* underscores the importance of this Court not adopting the decisions of the United States Supreme Court concerning the Fifth Amendment privilege as the measure of the state privilege without independent consideration by this Court.

KAVANAGH and CAVANAGH, JJ., concurred with LEVIN, J.